## JAMES L. ROSE AND JUDY S. ROSE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 25635-83.     Filed February 5, 1987.

*Robert L. Ackerson* and *Steven A. Goodman*, for the petitioners.

*Albert Russo*, *William S. Garofalo*, and *Matthew Magnone*, for the respondent.

COHEN, *Judge*: Respondent determined deficiencies of $191,335 and $302,451.12 in petitioners' Federal income taxes for 1979 and 1980, respectively. The issues for determination are (1) whether petitioners are entitled to depreciation and miscellaneous deductions and investment tax credit in relation to their purchase from Jackie Fine Arts of photographic transparencies of Picasso paintings and related production rights; (2) whether petitioners are entitled to deduct interest (a) accrued or (b) paid on partial recourse notes used in such purchase; and (3) whether petitioners are liable for additional interest under section 6621(d). [1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

Petitioners James L. Rose (Mr. Rose) and Judy S. Rose (Mrs. Rose) were residents of Kentucky at the time they filed their petition herein.

Mr. Rose was for many years president of coal mining and sales companies headquartered in London, Kentucky. Certain of the companies were originally started by Mr. Rose and his mother in the early 1960's. The companies enjoyed increasing sales until they were sold in 1973. Under Mr. Rose's guidance, annual revenues of the coal mining companies increased from several hundred thousand dollars to approximately $5 million. Mrs. Rose also worked with the coal mining companies prior to 1973. After 1973, petitioners invested in various business activities, including oil drilling programs, with varying degrees of success. In 1978, Mr. Rose became involved in the banking business, and at the time of trial, he was president of a multibank holding company. None of the businesses in which petitioners had an interest prior to 1979 involved art or were otherwise similar to the art business. Petitioners had no particular training in art prior to the years in issue.

During 1979, petitioners considered alternative investment opportunities, including real property and railroad cars. Mrs. Rose found that she needed less time to devote to petitioners' children, and she became interested in finding an activity that she could pursue as a business.

In late 1979, a securities broker mentioned Jackie Fine Arts (Jackie) to Mr. Rose. Jackie was a corporation that had been involved in the marketing of lithograph tax shelters beginning in 1977. In 1979, Herman Finesod (Finesod), on behalf of Jackie and its affiliate, Art Masters International, Inc. (Art Masters), as "Buyer" entered into an agreement with Paraselenes S.A., as "Seller," a company controlled by Marina Picasso (Marina), the granddaughter of Pablo Picasso (Picasso). In a contract dated December 6, 1979, Paraselenes S.A. represented that it was—

the owner of the reproduction rights to in excess of 1,000 paintings, charcoal drawings and other works of art created (excluding ceramics and sculptures) by Pablo Picasso (hereinafter collectively referred to as the "Marina Picasso Reproduction Collection"). Buyer desires to obtain from the Seller the exclusive rights throughout the world to reproduce the Images contained in the 1,000 works of the Marina Picasso Collection (the material used to reproduce such Images hereinafter called "Repro-

duction Masters"). Seller is willing to sell to Buyer up to 1,000 Reproduction Masters, and to grant Buyer the exclusive rights to exploit the Reproduction Masters and Images contained therein throughout the world * * *

## Under the heading "Definitions," the contract provided:

(b) "Reproduction Master" means a photoscreen negative or other material, such as metal plates or stones, used to produce an Image; but does not include the original work of art created by Pablo Picasso containing such Image. The Reproduction Masters shall be produced by the Seller under the supervision of Marina Picasso.

(c) "Image" means the visual result of works in the Marina Picasso Collection.

(d) "Print" means a lithographic reproduction of the original work, serigraph or similar impression created from a Reproduction Master. The term 'lithograph' does not include any original production created by Pablo Picasso.

(e) "Limited Edition" means Prints produced through fine art reproductive techniques or by or under the supervision of Marina Picasso. The size of a Limited Edition shall not exceed 500 in number, which Marina Picasso will number and write in handwriting "Collection Marina Picasso," plus 34 more, which she will number in Roman numerals and write in handwriting "Marina Picasso Collection." The Limited Edition cannot itself be reproduced with the handwritten "Collection Marina Picasso".

(f) "Stamped Poster Edition" means an edition of 1,000 posters using an Image, whether Print or a reproduction on which the stamped name of Marina Picasso appears.

(g) "Poster Edition" means an unstamped edition using an Image, whether Print or a Reproduction.

(h) "Products" means all other items on which the Image is reproduced other than Limited Editions, Prints, Stamped Poster Editions and Poster Editions (excluding however, works reproduced in bibliographic editions).

Payment to the seller under the contract for the acquisition of each Reproduction Master was $10,000 plus a nonrecourse promissory note in the amount of 60 percent of the principal amount received by Jackie from any ultimate purchaser of the Reproduction Master and related rights (the Picasso packages). The contract was for a period of 15 years and contained certain minimum guaranteed payments, including $1 million per year for the first 5 years of its term. The following pertinent additional terms were set forth in the contract:

5. *Value of Copyright*: As to each of the Reproduction Masters, Buyer and Seller agree that the value of the copyright granted herein in respect

of the Image forming a part of the Reproduction Master and the portion of the purchase price related thereto is $5,000.

6. *Sale of Reproduction Master*: Upon the purchase by the Buyer of a Reproduction Master, Buyer shall receive the following rights:

(a) The Reproduction Master;

(b) The copyrights referred to in Section 4.

(c) The exclusive right to use, control, control the use, manufacture, sell and distribute, promote, advertise and license the Reproduction Master and any Image therein in any and all fields of use whether now known or hereafter developed for any and all purposes subject, however (1) to the limitation provided in Section 12 and (2) the exclusive license granted to Seller hereunder to reproduce the Images in bibliographic editions, and subject also to the "Droit Moral" as that term is defined by French law.

(d) The exclusive right to copy, produce, reproduce and duplicate the Reproduction Master and any Image therein by any means and in any medium whether now known or hereinafter developed; subject to the exclusive license granted by the Buyer to the Seller hereunder to reproduce the Images in bibliographic editions.

(e) The right to receive and hold statutory copyrights to the Images therein in the entire world and any extension or renewal thereof in the name or for the benefit of the Buyer, its assigns or nominees;

(f) The right to authorize others, directly or indirectly, to exercise all and any of the foregoing rights subject to the obligations contained herein.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

(8) *Royalty-Free License*: Simultaneously herewith Buyer hereby grants the Seller a royalty-free exclusive license to reproduce the Image contained in the Reproduction Masters which are the object of this Contract in all bibliographic editions until the reproduction rights fall into the public domain. Notwithstanding the foregoing, the Buyer or its assigns shall have the right to reproduce the Images in pamphlets, brochures and catalogues used as publicity or promotional material in connection with the sale or exploitation of the Reproduction Master, Limited Editions, Prints, Posters and Products, etc. produced therefrom.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

(12) *Respect for Picasso Images*: The Buyer agrees that in no event will the Reproduction Master or the Images be used on any item or in any way which would denigrate the name, honor, reputation or memory of Pablo Picasso, as provided in the Droit Moral.

In 1979, Jackie sold 109 Picasso packages to investors. A total of 223 packages was sold over the life of the program.

In marketing the Picasso packages, Jackie provided to prospective purchasers a series of materials, including "Information Memoranda," tax opinions, "Fact Sheets," and letters. Each emphasized at great length the purported

tax benefits of the acquisition of art masters. Typical of the marketing materials was an October 1979 Information Memorandum for the Sale of Art Masters, which summarized the program as follows:

The Product

Jackie Fine Arts markets art masters, each consisting generally of silkscreen mylars, lithographic plates and mylars, or photoscreen negatives of an original work of art, together with related copyrights. The artist has agreed to cooperate in the production of 100 to 300 limited edition graphics from the art master, which will be signed and numbered by the artist. The art master purchaser will pay for the costs of production of these graphics.

Purchase Price

The purchase price of each art master will vary according to a number of factors, such as the prior sales history of the artist's works. Purchase prices for art masters range from $152,000 to $370,000. Each purchaser will receive the opinions of two qualified appraisers that the fair market value of the art master is at least equal to the purchase price.

Financing Available

The purchase price is payable as follows:

1. Cash Portion: 50% at closing and 50% by delivery of purchaser's negotiable promissory note, 8% interest, due February 1, 1980, secured by a letter of credit.

2. Deferred Portion: Non-negotiable partial recourse promissory note due January 15, 1991, bearing 6% interest, secured by the art master, products derived therefrom, associated copyright and 50% of all proceeds from products. Personal liability on the note is limited to a portion of the note and all payments on the note are first applied to reduce the portion for which the purchaser is personally liable. Prepayment of the note is required to the extent of 50% of gross receipts after deduction of marketing or gallery fees.

Marketing

Sales are the responsibility of the purchaser, through an art gallery or distributor of his choice. Jackie Fine Arts will not assist the purchaser in the commercial exploitation of the art master.

Tax Considerations

Jackie Fine Arts has received opinions of its counsel, Meserve, Mumper & Hughes, Los Angeles and Chadbourne, Parke, Whiteside & Wolff, New York, concerning tax matters, which are attached as Exhibits. Subject to the discussion contained therein, the opinions conclude that a purchaser is entitled to a 10% investment tax credit and accelerated depreciation deductions based on the entire purchase price of the art master. A purchaser who properly elects the accrual method of accounting for his trade or business of exploiting the art master is also entitled to *currently*

accrue interest deductions on his notes, including the partial recourse note, and a cash basis taxpayer is entitled to a deduction for interest when actually paid. The investment credit available to the purchaser of an art master is not affected by the "at risk" limitation contained in the Code; however, losses incurred in the venture are subject to that limitation. A cash payment made by a purchaser, and all notes as to which the purchaser is personally liable, including the recourse portion of the partial recourse note, qualify as amounts at risk. Accordingly, purchasers of art masters will be allowed to deduct losses up to the total of those amounts. The availability of a substantial portion of these tax benefits depends on a factual determination that the purchaser is acquiring the art master with the intent to engage in the business of exploiting the art master in order to make a profit (aside from tax benefits), and that the fair market value of the art master is at least equal to the purchase price. The opinions are therefore issued in reliance on the existence of such facts. The above summary is qualified in its entirety by the detailed information appearing elsewhere in this Information Memorandum.

In schedules labeled "Illustration of Tax Consequences," Jackie projected ratios of not less than 4 tax "write-off" dollars to $1 invested in the year of acquisition and not less than 3.3 to 1 in the second year of ownership of the art master packages.

The Picasso packages were specifically promoted in a letter signed by Finesod, dated December 22, 1979, containing the following paragraphs:

We are pleased and honored, after two years of negotiations, to announce that Jackie Fine Arts has obtained the exclusive right to market art masters which are images from Picasso's private collection which have never been made available for purchase by the public. This purchase includes a limited edition of 500 plus 1000 posters.

Jackie Fine Arts is also very pleased to present its art master program for 1979, a sound leveraged tax shelter program which complies fully with the Tax Reform Act of 1978 At Risk Ruling (HR 13511).

The economics in art are excellent and participation in the art master program offers a 4 to 1 write-off for this year and approximately 3.7 for next year.

Our two tax opinions, included in the memorandum, are from Chadbourne, Parke, Whiteside & Wolff, New York City, and Meserve, Mumper & Hughes, Los Angeles, both large, prestigious and highly-regarded law firms. Legal defense, if ever required, is handled by Friedman & Shaftan, P.C., New York City.

Jackie Fine Arts also has exclusive rights to other major artists of the world such as Larry Rivers, Karel Appel, Chryssa, Ralph Goings, Richard McLean, Lowell Nesbitt, Mel Ramos, Soto, Alex Katz and Peter Max.

Our staff of in-house attorneys, CPA's and art experts has been expanded to provide all the services that a purchaser will require.

We have enclosed a Fact Sheet for your consideration. Given the brief time left in the 1979 taxable year and as this will be the last opportunity to invest in our 1979 program, it would be advantageous for you to speed your inquiries by telephoning * * *

We look forward to assisting you with your financial requirements.

According to Finesod, new "at risk" rules adopted by Congress in 1978 were the only reason that the 1979 and subsequent Picasso package programs used partial recourse notes as a means of financing acquisition of Picasso packages by investors. Earlier programs marketed by Jackie had used nonrecourse financing. In the October 1979 Information Memorandum, Jackie represented:

"At Risk" Limitation

The Revenue Act of 1978 has extended to art masters the 'at risk' rule originally adopted in 1976. Under this rule, a taxpayer is generally not permitted to take deductions from an activity in excess of his amount at risk in the activity. A taxpayer is generally considered to be at risk with respect to the total of amounts of cash committed to the activity plus liabilities incurred in the activity for which he is personally liable. The rule has no effect on the computation of the investment credit. *The total of the cash portion of the purchase price plus the recourse notes and the recourse portion of the partial recourse note is approximately sufficient, despite the at risk rule, to permit the maximum deductions for depreciation and interest in the first two years after purchase.* The purchaser is personally liable for full payment of principal and interest on the First Note due February 1, 1980, and personally liable for that portion of the principal of the Second Note, due January 15, 1991, or earlier upon default, as set forth therein (see appendix). [Emphasis supplied.]

The financial projections in the Jackie marketing materials contained no assumptions concerning revenues to be realized from sales of products by investors. The October 1979 Information Memorandum, for example, stated:

GENERAL ASSUMPTIONS

A. Although it is anticipated that there will be significant revenue from the sales of products generated from the art master, they are omitted for illustration purposes. Similarly omitted are costs and expenses of exploitation other than the $3,500 initial production costs, depreciation and interest.

B. The entire purchase price is allocated to the Art Master.

C. This illustration is based on an Art Master valuation equal to the purchase price as supported by appraisals.

D. The taxpayer has the intent of exploiting the art master through a trade or business with a view to earning an economic profit.

## Petitioners' Acquisitions

Upon hearing about the Jackie programs, Mr. Rose directed Robert Metry (Metry), a salesman for Jackie, to send information regarding Jackie's program to George Krauser (Krauser), a certified public accountant and tax partner in a large public accounting firm, who advised petitioners on tax planning. Metry sent to Krauser a handwritten letter dated December 19, 1979, as follows:

The minimum recommended to establish a trade or business:

1. Establish a fictitious name proprietorship (d.b.a.).
2. Set up separate checking account and business records.
3. Adopt accrual accounting method.
4. Put plate into service and complete limited print edition.
5. Select and contract with a distributor (we supply a list of distributors at your request).
6. Maintain current sales and inventory accounts (information is supplied by the distributor).
*7. Purchaser understands and intends that the activity be entered into for profit.

I can amplify on this list in order that the purchaser not feel overwhelmed. However, the fact of these activities makes the "business purpose" much more credible than almost any other program, including the limited partnerships where the general partner "does everything."

Krauser also reviewed other material from Jackie, including tax opinion letters. He spoke by telephone to a lawyer at Chadbourne, Parke, Whiteside & Wolff with respect to that firm's tax opinion letters. On his records of services rendered for petitioners during December 1979, Krauser recorded services performed in relation to Jackie, as well as other services, as "tax shelter." Although he received information concerning projected estimated revenues from Metry, the information received did not involve Picasso packages. Krauser did not conduct any independent verification of the reasonableness of those projections, the basis for the projections, or the marketing or sale of the Jackie products. Krauser had no experience in the art business.

On December 26, 1979, a meeting was held in Krauser's office among petitioners, Krauser, and Metry. They reviewed the tax aspects of the Jackie program. Petitioners reviewed tear sheets of Picasso images that were offered as part of the Jackie program and selected two images known as "Gueridon" and "Tete," based solely on their personal subjective intuitive belief as to what would be publicly acceptable. Before selecting the images, petitioners did not have available any independent appraisals of the value of the Picasso packages. Petitioners thereupon entered into contracts with Jackie, by which they acquired two Picasso packages. With respect to each package, petitioners and Jackie, by Finesod, executed a Purchase and Security Agreement specifying a total purchase price of $550,000, allocated $545,000 to the "Master" and $5,000 to the "Copyright." An additional $5,000 was specified as "Cost of Production of Limited Edition" of 500 prints and 1,000 posters reproduced from the image.

In relation to each of the Picasso packages acquired in December 1979, Mr. Rose agreed to pay $40,000 cash on closing; $40,000 due April 1, 1980, and $20,000 due February 1, 1981. Interest at the rate of 8 percent per annum was due at the time of these payments. Mr. Rose also agreed to execute a note for a "deferred balance" of $450,000, of which $200,000 was labeled "recourse" and $250,000 was labeled "nonrecourse." The deferred balance note was payable on January 15, 1991, together with interest at the rate of 6 percent; no interest, however, was due until the principal was paid in full. All interest was nonrecourse. The deferred balance note was expressly labeled "non-negotiable."

By checks dated December 26, 1979, petitioners paid $40,000 on the purchase price of each of the Picasso packages acquired on that date and $5,000 for production costs in relation to each master. On April 4, 1980, they made two $40,000 payments of the amounts due under the first note. They made no additional payments on the purchase price of either of the Picasso packages acquired in December 1979.

The "Master" referred to in the Purchase and Security Agreement between petitioners and Jackie and the "Repro-

duction Master" referred to in the contract between Jackie and Paraselenes S.A. is a 35 mm slide or a "4 × 5" color transparency (hereinafter transparency). The transparency was made by photographing the original artwork and cost approximately $200 to produce. The printing of a lithograph limited edition is a multi-step process. First, a C-print or a photographic enlargement is made from the transparency. The C-print is blown up to the size of the limited edition. A key line or mylar is made by a chromist, who is an artist. A separate key line or mylar is made for each color of the image. Each mylar or key line is then chemically and mechanically transferred by the printer to a separate aluminum plate. Each aluminum plate is chemically treated and then ink is applied. Finally, a piece of paper is pressed against the aluminum plate and the process is repeated for each color, forming a trial proof.

Upon the acquisition of a Picasso package by an investor, Jackie sent the subject transparency to a printer. The printer examined the transparency by viewing it through a light box to determine the number and the trueness of the colors. The printer could not, however, determine whether the transparency was an accurate copy of the original image without comparing the transparency with the original. The printer signed a letter, prepared by Jackie, stating that the "plate" for the investor's Art Master was ready to be put into service for production of a limited edition. Petitioners received printers' letters dated January 27, 1980, and February 26, 1980, in regard to Gueridon and Tete, respectively, purporting "to certify that the plate for the Art Master * * * was tested by December 31, 1979 and was ready to be put into service for production of the Limited Edition you've ordered."

In February, March, April, and July 1980, Krauser performed additional services for petitioners in relation to their tax planning for 1979 and 1980, including, on March 27, 1980, and July 1, 1980, services relating to petitioners' investments with Jackie.

In April 1980, for the stated purpose of distribution of limited edition prints and posters, petitioners organized a sole proprietorship with the trade name Lecia Arts. They elected accrual accounting for the entity. Mrs. Rose went to

New York in the spring of 1980 to investigate the artwork distribution process. She requested from Jackie a list of distributors. She was assured by Jackie that limited editions of the masters acquired by petitioners would be available in June 1980.

In June 1980, petitioners acquired a third Picasso package, which included the image "Tete de Femme." The rights acquired by petitioners were described in the same terms as those involved in their 1979 acquisitions. The cash portion of the $550,000 purchase price was payable as follows:

| | |
|---|---:|
| Cash on closing | $20,000 |
| Amount due Oct. 1, 1980 | 20,000 |
| Amount due Feb. 1, 1981 | 40,000 |
| Amount due Feb. 1, 1982 | 20,000 |

The stated recourse portion of the deferred long-term note was in the amount of $250,000, and the stated nonrecourse portion was $200,000, both reflected in a non-negotiable promissory note due June 1, 1994, with 6-percent interest. In the event of default, the "fair market value" of the Reproduction Master, which was collateral for the note, could be applied against the recourse portion of the note.

In connection with their acquisition of the Picasso package, on June 23, 1980, petitioners paid $6,000 for production costs and $20,000 for their initial cash payment. No other payments to Jackie were made on account of the purchase price of Tete de Femme.

On June 23, 1980, Mrs. Rose sent form letters to potential distributors inquiring as to their interest in merchandising limited edition prints.

In the spring of 1980, Mrs. Rose met Marilyn Goldberg (Goldberg), owner of Marigold Enterprises, Ltd. (Marigold). Marigold marketed ancillary products, such as scarves and other textiles, tapestries, porcelain and ceramics, posters, and greeting cards, produced from lithograph art. Goldberg was an art adviser for Jackie in 1978 and 1979 and was a vice president of Fine Arts Acquisitions in 1981.

Also in the spring of 1980, Mrs. Rose met Ron Parker (Parker), president of Fine Arts Acquisitions. Mrs. Rose consulted with Parker in relation to the opening of two art galleries. With Parker and a personal friend who had also invested in one of the Picasso packages, petitioners opened

an art gallery in Knoxville, Tennessee, in November 1980. With Parker's assistance, petitioners and their friend invested in a gallery in Atlanta, Georgia, which opened in or about February 1981. Petitioners disposed of their interests in both galleries in 1983.

Shortly after the contract between Paraselenes S.A. and Jackie was executed in December 1979, other heirs of Picasso began to challenge the right of Marina to enter into the agreement. On October 25 and 26, 1980, Jackie entered into new agreements with Marina and with an entity known as Visual Artists & Galleries Association, Inc. (VAGA), a representative of other heirs to the Picasso estate. Fifty percent fewer Reproduction Masters were to be made available to Jackie under the 1980 agreement because the heirs of Picasso were concerned that the release of a large number of images would adversely affect value. Under the new agreement, Jackie agreed to use "its best efforts" to require the purchasers of 109 Picasso packages sold in 1979 to agree to have any products made from their images approved in advance by VAGA's nominee. Jackie advised the purchasers, including petitioners, that they were required to submit all products for approval.

Prior to the settlement of the dispute between Marina and VAGA, posters were made from petitioners' image Tete. After the settlement, Jackie instructed the printer to destroy the posters, pursuant to instructions from VAGA. Subsequent reproductions prepared from the images acquired by petitioners were submitted for approval. Petitioners, however, did not receive any approved limited editions prior to November 1982.

On November 8, 1982, Mr. Rose filed an action in the U.S. District Court for the District of Kentucky against Jackie and Finesod (the Federal action). After the Federal action was dismissed for lack of diversity, Mr. Rose filed an action in the Kentucky State court (the Kentucky action). In addition to Jackie and Finesod, named defendants in the Kentucky action were Art Masters International, Metry, Sigmund Rothschild, F. Peter Rose, and others. In both actions, petitioners sought rescission of the contracts with Jackie and return of the amounts paid under the contracts; judgment for $2 million in lost profits and $500,000 in lost

tax benefits; and punitive damages. The Kentucky action was still pending as of trial of this case in February 1986.

### Fair Market Value of Picasso Packages

Pablo Picasso was one of the creative geniuses of the 20th century and an innovator and contributor to many of its major art movements, such as Cubism and Surrealism. Some of his works are considered milestones in 20th century art. The value of his original works varies greatly, however. He was at the forefront of some of the major art movements of this century, constantly experimenting and trying new ideas. Picasso was a painter, sculptor, and print maker, making contributions in all artistic mediums.

During his career, Picasso was directly involved in creating more than 2,000 different prints. He actually supervised or worked directly on the plate, block, or stone used in making such prints and signed and numbered each print made in that process. In 1979, more than 1,000 prints signed and numbered by Picasso were sold at auction. The auction price for these prints ranged from $157 to $137,500.

The Reproduction Masters involved in the Picasso packages sold by Jackie and purchased by petitioners were different. They were to be made by a variety of different artists and printers and signed by Marina, Picasso's granddaughter. Such reproductions are not the equivalent of prints or lithographs made or signed by the creator of the original work. The signature of Marina would not add materially to the value of any limited edition. Although the reproductions and posters ultimately delivered to petitioners in 1982 were of good quality, they had no proven market or marketability. Posters produced pursuant to the agreements between Jackie and petitioners would be competing with reproduction posters selling in museum shops at prices ranging from $1 to $30.

Purchasers of Picasso packages from Jackie in 1979 or 1980, including petitioners, received appraisals of their purchases from F. Peter Rose (F.P. Rose) and Sigmund Rothschild (Rothschild). F.P. Rose and Rothschild prepared approximately 1,500 appraisals for Jackie, of which approximately 200 related to Picasso packages. F.P. Rose received between $150 and $300 per appraisal from Jackie, and

Rothschild received $250 per appraisal from Jackie. The appraisals were set up on a fixed format, in which the name of the purchaser and the name of the image were inserted when a Picasso package was sold.

Rothschild placed a value of $750,000 on each Picasso package appraised by him at the beginning of the program but increased the value to $800,000 at a later stage. F.P. Rose appraised each Picasso package sold from 1979 through the summer of 1980 at $675,000; he raised his appraisals to $700,000 from the summer of 1980 to the winter of 1981 and to $750,000 from the winter of 1981 until 1982. F.P. Rose's reports were prepared in Rothschild's office on Rothschild's word processor.

After they acquired the Picasso packages, petitioners received appraisals from F.P. Rose and Rothschild as follows:

| Image (Date acquired) | F.P. Rose Appraisal (Date appraised) | Rothschild appraisal (Date appraised) |
| --- | --- | --- |
| Gueridon (12/26/79) | $675,000 (1/14/80) | $750,000 (1/14/80) |
| Tete (12/26/79) | $675,000 (1/14/80) | $750,000 (1/14/80) |
| Tete de Femme (6/23/80) | $675,000 (7/1/80) | $750,000 (7/1/80) |

All of the appraisal letters set forth in identical language the credentials of the appraiser, a summary of Picasso's career, and reference to the sales prices of graphic prints directly prepared by other well known artists. Although expressing familiarity with the terms of the Picasso packages, neither F.P. Rose nor Rothschild expressed any opinion as to the probable selling price of any of the prints or posters to be created from the Reproduction Master or any other facts justifying the expressed opinion of value. In the letters dated January 14, 1980, both F.P. Rose and Rothschild referred to Gueridon as a "Serigraph." On June 9, 1980, F.P. Rose and Rothschild sent letters to petitioners stating that Gueridon was not a serigraph but that the difference did not affect their appraisals in any way.

F.P. Rose and Rothschild were defendants in the Kentucky action brought by petitioners against Jackie. Nonetheless, they were the only expert witnesses called by petitioners at trial as witnesses to substantiate the claimed

values of the Picasso packages. Shortly prior to trial in February 1986, each prepared a schedule purporting to justify his 1980 appraisals. F.P. Rose supported his prior appraisal by the following assumptions:

PROPOSED MARKETING PLAN FOR PICASSO IMAGES

Signed and numbered limited edition (500)
(Signed by Marina Picasso)

| | |
|---|---:|
| 150 at $600 | $90,000 |
| 150 at 800 | 120,000 |
| 150 at 1,200 | 180,000 |
| 50 at 2,000 | 100,000 |
| | 490,000 |
| 1,000 Posters at $60 | 60,000 |
| 10,000 Posters at $12.50 | 125,000 |

Fine art edition (signed in the plate)

| | |
|---|---:|
| 1,500 at $150 | 225,000 |

Unlimited (publishers edition)

| | |
|---|---:|
| 10,000 at $45 | 450,000 |
| Gross potential sales | 1,350,000 |

Net potential income after production
sales, distribution, advertising
costs, etc. (50%) ................................ 675,000

Rothschild projected value as follows:

Appraised value of plate image:    $750,000

| | | |
|---|---|---:|
| A. Retail selling price of signed 500 edition (average $650) Pencil-signed and numbered limited edition print: | | 325,000 |
| B. Fine art edition: | 1,000 at $175 | 175,000 |
| (Signed in the plate) | | |
| C. Publisher's 1st edition: | 5,000 at $45 | 225,000 |
| (Signed in the stone) | | |
| D. Second edition: | 5,000 at $20 | 100,000 |

*Ancillary Uses*:
(Free interpretations of original work)
Miscellaneous novelty applications such as:

| | | |
|---|---|---:|
| (1) Poster edition | 15,000 at $20 | 300,000 |
| (2) Woven tapestries | 50 at $4,000 | 200,000 |
| (3) Puzzles, calendars | 10 [sic] at $6.50 | 65,000 |
| (4) Stained glass windows | | |
| (5) Stationery and cards | | 25,000 |
| (6) Fabric applications | | 50,000 |
| (7) Novelty applications | | |
| (8) Other-design royalties | | 50,000 |
| *Royalty potential and value of copyright*: | | 1,000 |

*Gross potential retail income:*

| | |
|---|---|
| *Net wholesale income* (50%): | $1,576,000 [sic] |
| (Includes sales and distribution, production and advertising costs) | |
| *Estimate of potential net income* (50%): | 788,000 |
| (Over a period of 12-13 years based on the value of today's dollar) | |

Neither F.P. Rose nor Rothschild provided any data to support their assertions as to sales potential of the products. They merely cited examples of sales of original works by various artists and ignored the distinction between such items and the Reproduction Masters they purported to appraise. None of the appraisals by F.P. Rose or Rothschild for Jackie took account of varying degrees of appeal of the images sold as part of the Picasso packages. None of them took account of the likely effect of simultaneous marketing of the number of reproduction prints and posters anticipated with each Picasso package multiplied by the number of Picasso packages sold by Jackie.

Although both F.P. Rose and Rothschild were qualified by training and experience to appraise (and to testify as expert witnesses), the exaggerated values claimed by them, the total lack of support for their methods, and the manner in which the appraisals were generated rendered their opinions totally unreliable and not worthy of belief.

Karen Carolan, an expert witness for respondent, received undergraduate and master's degrees in art history and developed expertise in late 19th century and 20th century art. She was an employee of the Internal Revenue Service for over 12 years, primarily reviewing tens of thousands of appraisals during that period. She served as chairperson of the Commissioner's Art Print Panel and chairperson of the Commissioner's Art Advisory Panel. Carolan prepared a valuation report in which she considered the background of Picasso, reported sales of Picasso prints in 1979, the specific aspects of the images acquired by petitioners, the methods of distribution of prints, and other relevant factors. She determined the probable retail and wholesale prices for each image and the probable percentage of sales

in each category. She projected total sales based on the following assumptions "with an optimistic range of possibilities":

|  | Retail | Wholesale |
|---|---|---|
| 1. Prices: *Nature Morte* (Gueridon) | $300 | $180 |
| *Tete de Femme* | $200 | $120 |
| *Figure (Tete)* | $250 | $150 |

2. Commissions to distributor of 50% on retail sales and 25% on wholesale sales.
3. Print sales: 10% - 20% on *Nature Morte* (Gueridon)
    10% - 15% on *Tete de Femme*
    10% - 25% on *Figure* (Tete)
4. Appreciation of 50% on 1/3 of the sales.
5. Breakdown of 1/2 retail - 1/2 wholesale of the sales.
6. An effective, knowledgeable distributor with a New York City gallery.

Carolan's report was detailed and persuasive, and her conclusions were summarized as follows:

*Conclusion*

As yet we have not considered the production costs and other fees which must also be deducted. The expenses of producing the limited edition of 500 and the poster edition of 1,000 were estimated at approximately $5,000 for each image. The miscellaneous fees (legal, accounting, etc.) are estimated at $1,000. Therefore, the net revenue projections from the limited edition and poster editions are as follows:

*Revenue projections*:

| | *Optimistic* | *Realistic* |
|---|---|---|
| 1. *Nature Morte* | | |
| (Gueridon) | 20% | 10% |
| Limited edition | $16,698.00 | $8,277 |
| Poster edition | 1,111.50 | 551 |
| | 17,809.50 | 8,828 |
| Less | 6,000.00 | 6,000 |
| Total | 11,809.50 | 2,828 |
| | | |
| 2. *Tete de Femme* | *Optimistic* | *Realistic* |
| Limited edition | $7,990.00 | $4,790 |
| Poster edition | 1,111.50 | 551 |
| | 9,101.50 | 5,341 |
| Less | 6,000.00 | −6,000 |
| Total | 3,101.50 | (−) 659 |
| | | |
| 3. *Figure* (Tete) | *Optimistic* | *Realistic* |
| Limited edition | $17,380.00 | $10,442 |
| Poster edition | 1,111.50 | 551 |
| | 18,491.50 | 10,993 |
| Less | 6,000.00 | 6,000 |
| Total | 12,491.50 | 4,993 |

Sylvan Cole, respondent's second expert witness, had dealt exclusively in the sale, publishing, and exhibition of original prints for 40 years as of the time of trial. He reviewed the documents relating to petitioners' acquisition of Picasso packages and visited galleries in an attempt to determine whether any reproduction prints from the Marina Picasso collection were available for sale. At one gallery, he was told that prints were available for sale for $450, or $400 if more than one were purchased. He concluded that the reproduction prints marketed as part of the Picasso packages were being misrepresented as equivalent to lithographs actually made by Picasso.

Cole concluded that, assuming the highest possible retail price and that all of the limited editions and poster editions were sold, the following returns were projected:

| | | |
|---|---|---|
| Tete | 500 limited edition at $100 | $50,000 |
| Gueridon | 500 limited edition at   100 | 50,000 |
| Tete de Femme | 500 limited edition at     90 | 45,000 |
| Poster editions | 3,000 posters at $25 | 75,000 |
| Total retail | | 220,000 |
| Less distribution cost at 50% | | 110,000 |
| Total projected revenue | | 110,000 |

Cole noted that 50 percent of the total projected revenue would be paid over to Jackie (on the deferred purchase price), leaving $55,000 to petitioners under the above assumptions. Cole did not, however, believe that the total projected revenue would be realized, because he doubted that any market existed for the reproductions in question. He concluded that the images acquired by petitioners had no ancillary value, and that the Picasso packages had no economic feasibility whatsoever.

Although the lack of comparable sales of equivalent products makes valuation of the Picasso packages extremely difficult, respondent's experts' opinions were well reasoned, credible, and persuasive. The fair market value of the three Picasso packages acquired by petitioners, taken together, is necessarily less than the net revenues reasonably projected by Carolan, which were a total of $7,162 over an uncertain period of time. The fair market value of the Picasso packages acquired by petitioners in 1979 and 1980 was for all practical purposes negligible.

*Tax Treatment*

By letter dated February 25, 1980, Jackie forwarded to petitioners specimen Federal tax forms to assist in the preparation of their 1979 Federal tax returns. Included in the package were completed samples of Schedule C, Profit or (Loss) From Business or Profession, prepared on an accrual basis, with zero income filled in; Form 4832, ADR Class Life System Form; and Form 3468, Computation of Investment Credit.

On April 16, 1980, petitioners sent a letter to Friedman & Shaftan, the law firm mentioned in Jackie's December 1979 letter, inquiring as to the services to be provided to petitioners in the event of an Internal Revenue Service audit. By letter dated May 1, 1980, Friedman & Shaftan responded, assuring petitioners that the law firm would assist petitioners' counsel and accountants in the event of Internal Revenue Service challenge to the tax structure of the transactions set forth in the 1979 Jackie Information Memorandum.

On Schedule C to their 1979 income tax returns, petitioners reported an art print activity under the business name "Lecia Arts," zero income, and depreciation expense of $125,766. The depreciation was computed by applying the double-declining-balance method to a basis of $1,100,000 for the two Picasso packages acquired December 26, 1979, plus first-year depreciation of $4,000. In addition, petitioners claimed an investment tax credit on Form 3468, of which $110,000 was attributable to the Picasso packages acquired from Jackie. Petitioners reported 1979 taxable income exceeding $460,000.

On their 1980 joint individual income tax return, petitioners attached a Schedule C, reporting art prints activities under the name "Lecia Arts." They claimed depreciation of $341,795, interest of $76,331, and miscellaneous expenses totaling $1,144. The depreciation expense related to the three Picasso packages acquired from Jackie. On Form 3468 for 1980, petitioners claimed investment tax credit, of which $55,000 was attributable to the Picasso package acquired in June 1980. Petitioners reported 1980 taxable income exceeding $550,000.

In a statutory notice of deficiency dated June 8, 1983, respondent disallowed all of the Schedule C losses and investment tax credits claimed for 1979 and 1980 relating to the Picasso packages. Respondent determined that the losses were not incurred in an activity entered into for profit; the art masters were not used or available for use during 1979; and petitioners had not established depreciable basis, the useful life of the art masters, or the propriety of the depreciation method used. The interest deduction claimed on the 1980 Schedule C was disallowed on the ground that the notes were contingent, lacked economic substance, and did not represent bona fide debt obligations. The miscellaneous deductions were disallowed because it was not established that they represented ordinary and necessary business expenses. The investment tax credit was disallowed because petitioners had not established that the art masters qualified for investment credit and had not established the basis of the art masters.

By motion to amend the answer filed at the time of trial, respondent claimed additional interest under section 6621(d). The motion was subsequently granted.

### ULTIMATE FINDINGS OF FACT

Petitioners' acquisition of Picasso packages from Jackie Fine Arts in 1979 and 1980 was motivated primarily, if not exclusively, by tax considerations. There was no reasonable possibility that items produced from the Picasso packages would generate sales sufficient for petitioners to recoup their cash investment. Petitioners were relying on recovering their cash investment by immediate tax deductions and credits.

Petitioners did not have an actual and honest profit objective in acquiring the Picasso packages, and the transactions were devoid of economic substance.

### OPINION

With the exception of additional interest under section 6621(d), raised by the amendment to the answer, petitioners have the burden of proving that respondent's determinations are incorrect. *Welch v. Helvering*, 290 U.S. 111 (1933);

Rule 142(a), Tax Court Rules of Practice and Procedure. Particularly with respect to deductions, they must bring themselves within the terms of the applicable statutes. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934); *Bishop v. Commissioner*, 342 F.2d 757, 759 (6th Cir. 1965).

To qualify for the claimed depreciation deductions with respect to their acquisition of the Picasso packages, petitioners must demonstrate that the packages either were used in a "trade or business" or were held "for the production * * * of income" within the meaning of section 167(a). Under section 48(a)(1), the investment tax credit is allowable only for property with respect to which depreciation (or amortization in lieu thereof) is allowable. Thus petitioners' right to both depreciation deductions and investment tax credit depends upon their showing that their activities with respect to the Picasso packages either constituted a trade or business or were undertaken and carried on for the production of income. *Beck v. Commissioner*, 85 T.C. 557, 569 (1985), and cases cited therein.

Respondent has asserted various alternative theories under which petitioners' claimed deductions would be disallowed or reduced. Respondent argues that petitioners' acquisitions from Jackie were part of a tax-avoidance device, not motivated by legitimate business purposes and totally devoid of economic substance, and should therefore be disregarded for tax purposes. Alternatively, respondent argues that petitioners were not engaged in an activity for profit or a trade or business in 1979 or 1980 with respect to the Picasso packages acquired by them from Jackie. Under either of the above theories, according to respondent, petitioners would not be entitled to any deductions or credits. He acknowledges, however, that in 1980 petitioners paid $1,706 in interest on recourse debt, which would be permitted as a deduction under the opinion of the Court of Appeals in *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 96 (4th Cir. 1985), revg. on this issue 81 T.C. 184 (1983).

In the alternative, respondent argues that petitioners' basis in each Picasso package is limited to its fair market value, which is substantially less than the purchase price; that petitioners have not established their depreciable basis

or that the deferred portion of the purchase price should be included in basis; that petitioners are not at risk, within the meaning of section 465, for any amount of the partial recourse notes; that the deferred notes are not true indebtedness affording an interest deduction; and that the allocation of the bulk of the purchase price to the transparency was improper. Respondent also argues that petitioners improperly determined the dates on which their assets were placed in service, that they improperly computed their allowable depreciation deductions, and that miscellaneous deductions are not allowable because they were preoperating expenses, not substantiated, or not ordinary and necessary. Petitioners, of course, contend the opposite of each of the foregoing arguments raised by respondent.

For the reasons set forth below, we conclude that petitioners are not entitled to the investment tax credits claimed or to any deductions other than interest actually paid on the recourse portion of the indebtedness to Jackie. Our conclusion is based in part on consideration of other factors discussed by the parties in relation to the alternative arguments. Because the theories are overlapping and cumulative, we have attempted to set forth an approach that takes into account all relevant facts and applicable theories and reconciles to a manageable (i.e., not exhaustive) extent other cases fairly categorized as involving "tax shelters."[2]

This case lends itself to comprehensive analysis because (1) petitioners candidly admit that tax motives played a significant part in their decision to purchase Picasso packages; (2) respondent does not challenge petitioners' testimony concerning their reliance on Jackie and those associated with Jackie about salability of the Picasso reproduction prints and posters; (3) petitioners were not totally passive but actually engaged in post-acquisition

---

[2]We do not rely on or incorporate the definitions of "tax shelter" set forth in sec. 6661(b)(2)(C), adopted by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 323(a), 96 Stat. 324 (applicable to returns for which the due date is after Dec. 31, 1982) or sec. 6111(c), added by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 141(a), 98 Stat. 494, 682 (with respect to investments sold after Aug. 31, 1984). Such definitions create "statutory tax shelters." Nonetheless, our analysis is not inconsistent with those definitions, in part because they appear to be based on prior case law. We avoid the term "abusive tax shelter" because that term of art is in a statute giving jurisdiction to the district courts. See secs. 6700 and 7408. We also avoid the temptation to simply say "the facts speak for themselves."

activities regarding the assets acquired; and (4) the origin and design of the Jackie program can fairly be characterized as a tax shelter arrangement typical to the years in issue. Use of this occasion to formulate a unified approach is also justified by the necessity of re-examining our position on the deductibility of interest on recourse indebtedness in view of the reversal of our decision on that issue by the Court of Appeals for the Fourth Circuit in *Rice's Toyota World, Inc. v. Commissioner, supra.*

## Objective and Subjective Tests

In *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985), we considered whether a purchase and lease-back arrangement with a computer equipment leasing corporation entitled the taxpayers to deductions for depreciation and interest. We first concluded that the individual taxpayer had no business purpose for entering into the transaction other than tax avoidance. We then stated:

> Our analysis does not end here. Mr. Rice's failure to focus on the business or non-tax aspects of the transaction is not necessarily fatal to petitioner's claim. If an objective analysis of the investment indicates a realistic opportunity for economic profit which would justify the form of the transaction, it will not be classified as a sham.[17] In order to make this determination, we must probe beneath the labels given by the parties and view the transaction in the context of its surrounding facts and circumstances.

---

[17]In *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Government argued sham, but the Supreme Court rejected that argument because it found sufficient business purpose for the transaction. Once business purpose is established, the transaction should not be classified a "sham." A finding of no business purpose, however, is not conclusive evidence of a sham transaction. The transaction will still be valid if it possesses some modicum of economic substance. See also *Grodt & McKay Realty, Inc. v. Commissioner, supra* [77 T.C. 1221 (1981)] at 1243.

Conversely, transactions devoid of economic substance are not always shams such as where a taxpayer mistakenly believes there existed a potential for profit. But, when there is a finding that the taxpayer entered into the transaction for tax reasons only, then it is proper to subject the transaction to an objective economic analysis to determine whether there could have been an opportunity for profit.

> [81 T.C. at 203.]

After applying the above test, we concluded that the transaction in question in *Rice's Toyota* was a sham and disallowed all deductions.

The Court of Appeals for the Fourth Circuit affirmed our factual finding of a sham transaction, the disallowance of depreciation deductions, and the disallowance of interest on nonrecourse debt. The Court of Appeals reversed, however, the disallowance as a matter of law of interest arising out of recourse debt, stating:

it does not follow that the sham nature of the underlying purchase transaction also supports the Tax Court's conclusion that the recourse note debt was not genuine. *Grodt* [*Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981)] itself recognized that a sham transaction may contain elements whose form reflects economic substance and whose normal tax consequences may not therefore be disregarded. *Grodt*, 77 T.C. at 1243. * * *

      *       *       *       *       *       *       *

Under *Frank Lyon* [*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978)], the court may not ignore transactions that have economic substance even if the motive for the transaction is to avoid taxes. *See* 435 U.S. at 583-84, 98 S.Ct. at 1303-04. Moreover, IRC sec. 163 does not limit deductibility of installment interest expense depending upon the item purchased by the taxpayer. Therefore, although Rice did not for tax purposes purchase property with the recourse note and may not base depreciation deductions upon it, the note nevertheless represents genuine debt upon which Rice is entitled to deduct interest expense.
[752 F.2d at 96.]

In *Packard v. Commissioner*, 85 T.C. 397, 417-418 (1985), we stated:

The first prong of the sham inquiry, the business purpose inquiry, is a subjective test and simply concerns the motives of the taxpayer in entering the transaction. *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 92; see *Knetsch v. United States*, 364 U.S. 361 (1960). A taxpayer's failure to establish that a transaction was motivated by a business purpose rather than by tax avoidance is not conclusive, however, that the transaction was a sham. Rather, if an objective analysis of the transaction indicates that a reasonable possibility of profit existed apart from tax benefits, the transaction will not be classified as a sham. *Frank Lyon Co. v. United States*, 435 U.S. at 583-584; *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 203 & n. 17.

      *       *       *       *       *       *       *

Irrespective of petitioners' subjective motivation for entering into the transaction, if we find that the underlying transaction was supported by economic substance, we will not disregard it as a sham. See *Frank Lyon Co. v. United States*, 435 U.S. at 583-584; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 92.

The precise degree of business motive or economic substance that must be present in a transaction for tax recognition is not clearly defined. *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 202. As we noted in *Rice's Toyota World*, however, the presence of a genuine indebtedness supported by an actual investment is strong evidence of economic substance. 81 T.C. at 202.

In *Packard v. Commissioner, supra,* we found that the taxpayers had a business purpose and that they could possibly have benefited economically from the transaction. Nonetheless, we applied the step-transaction theory to recast the transaction so that the form reflected the true substance of the agreement between the parties. *Packard v. Commissioner*, 85 T.C. at 419-422.

In numerous other cases, we have concluded that transactions were totally devoid of economic substance and should be disregarded for tax purposes. We have recently summarized the holdings of such cases by stating:

A transaction is without its intended effect for Federal income tax purposes if (1) it is a sham, being a mere paper chase or is otherwise fictitious (*Falsetti v. Commissioner*, 85 T.C. 332 (1985)), or (2) the transaction is devoid of economic substance consonant with its intended tax effects (*Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Knetsch v. United States, 364 U.S. 361, 366 (1960)).* The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance—features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. at 583-584; *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982).

It must be recognized that the tax laws affect the shape of every business transaction. The parties to a transaction are entitled to take into account and to maximize favorable tax results so long as the transaction is compelled or encouraged by non-tax business reasons. *Frank Lyon Co. v. United States*, 435 U.S. at 580.

[*James v. Commissioner*, 87 T.C. 905, 918 (1986).]

Key indicators of presence or a lack of economic substance include presence or absence of arm's-length price negotiations, the relationship between the sales price and fair market value, the structure of financing of the transaction, whether there was a shifting of the benefits and burdens of ownership, and the degree of adherence to

contractual terms. See, e.g., *Karme v. Commissioner*, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); *Zirker v. Commissioner*, 87 T.C. 970 (1986); *Helba v. Commissioner*, 87 T.C. 983 (1986); *James v. Commissioner, supra*; *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981).

In numerous other cases, the focus of the opinion is on the subjective, or "business purpose," test; i.e., whether a taxpayer had an "actual and honest profit objective" or was subject to limitations on deductions under section 183(a). In *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976), we stated:

> The legislative history surrounding section 183 indicates that one of the prime motivating factors behind its passage was Congress' desire to create an objective standard to determine whether a taxpayer was carrying on a business for the purpose of realizing a profit or was instead merely attempting to create and utilize losses to offset other income. S. Rept. No. 91-552, to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess. 104 (1969).
>
> In an effort to comply with the congressional purpose of establishing objective tests to determine subjective intentions, the Commissioner promulgated regulations under section 183 which set forth nine separate factors which should be examined in making a profit-motive determination. Sec. 1.183-2(b)(1)-(9), Income Tax Regs. The regulations further provide, however, that these enumerated factors are neither exclusive nor necessarily controlling in each case and that "all the facts and circumstances with respect to the activity are to be taken into account." Sec. 1.183-2(b), Income Tax Regs.[6]
>
> Further, we note that the test under section 183 is not whether the taxpayer's intention and expectation of profit is reasonable but rather whether such intention and [objective] is bona fide. S. Rept. No. 91-552, *supra* at 103; sec. 1.183-2(a), Income Tax Regs.; *Francis X. Benz*, 63 T.C. 375 (1974).

---

[6]Because of the breadth of the statutory language, sec. 183 is clearly applicable in the instant case. However, the legislative history behind that section indicates that it was primarily directed at losses incurred in farming and other "hobbies." S. Rept. 91-552, to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess. 103 (1969). Therefore, while we think the section must be considered, we have not found the enumerated "relevant factors" in the regulations very helpful.

See also *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court.

In attempting to apply objective factors[3] to determine

---

[3]Sec. 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulation are as follows:

(1) Manner in which the taxpayer carried on the activity.

subjective intent under section 183, we have said that no one factor is determinative, that the absence of a particular indicium of profit may be more significant to our determination than the superficial presence of another indicium, and that mere statements of intent will not be controlling. See *Beck v. Commissioner*, 85 T.C. 557, 570 (1985), and cases cited therein.

We have also noted that the cases decided under section 183 use such words as "basic," "dominant," "primary," "predominant," and "substantial" to describe the requisite profit motive (*Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981)) but do not demonstrate application of a precise standard. See *Estate of Baron v. Commissioner*, 83 T.C. 542, 558 (1984), affd. 798 F.2d 65 (2d Cir. 1986), and *Fox v. Commissioner*, 82 T.C. 1001, 1020-1021 (1984).[4]

Review of those cases applying the "subjective test" (of section 183) shows common characteristics reminiscent of those in which the "objective test" (of economic substance) has been applied: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. In cases having these characteristics, tax motivation is apparent. The question addressed is whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits. Such cases, hereinafter referred to as

(2) The expertise of the taxpayer or his advisors.

(3) The time and effort expended by the taxpayer in carrying on the activity.

(4) Expectation that assets used in activity may appreciate in value.

(5) The success of the taxpayer in carrying on other similar or dissimilar activities.

(6) The taxpayer's history of income or losses with respect to the activity.

(7) The amount of occasional profits, if any, which are earned.

(8) The financial status of the taxpayer.

(9) Elements of personal pleasure or recreation.

[4]See also Gideon, "Mrs. Gregory's Grandchildren: Judicial Restriction of Tax Shelters," 5 Va. Tax Rev. 825, 834-839 (1986).

"generic tax shelters,"[5] involve a variety of assets, such as:

(a) Books.—*Beck v. Commissioner, supra; Elliott v. Commissioner*, 84 T.C. 227 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir.), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir.), affd. without published opinion sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5-7, 9 (3d Cir. 1984); *Dean v. Commissioner*, 83 T.C. 56 (1984); *Fuchs v. Commissioner*, 83 T.C. 79 (1984).

(b) Master Recordings.—*Estate of Baron v. Commissioner, supra; Flowers v. Commissioner*, 80 T.C. 914 (1983); and numerous Memorandum Opinions of the Court.[6]

(c) Lithographic materials.—*Miller v. Commissioner*, T.C. Memo. 1986-390; *Harrington v. Commissioner*, T.C. Memo. 1984-428, affd. without published opinion 774 F.2d 1151 (3d Cir. 1985); *Reali v. Commissioner*, T.C. Memo. 1984-427.

(d) Innovations/Inventions.—*Hagler v. Commissioner*, 86 T.C. 598 (1986), on appeal (11th Cir., Sept. 15, 1986) and (2d Cir., Sept. 26, 1986); *Herrick v. Commissioner*, 85 T.C. 237 (1985); *Sutton v. Commissioner*, 84 T.C. 210 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986), and affd. sub nom. *Knowlton v. Commissioner*, 791 F.2d 1506 (11th Cir. 1986); *Powell v. Commissioner*, T.C. Memo. 1986-369.

(e) Mining ventures.—*Capek v. Commissioner*, 86 T.C. 14 (1986); *Thomas v. Commissioner*, 84 T.C. 1244 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); *Ramsay v. Commissioner*, 83 T.C. 793 (1984).

(f) Films.—*Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Jameson v. Commissioner*, T.C. Memo. 1985-262; *Jaros v. Commissioner*, T.C. Memo. 1985-31; *van Allen v. Commissioner*, T.C. Memo.

---

[5] Generic tax shelters are distinguishable from statutory tax shelters (see note 2 *supra*) and other specific types of tax-preferred activities, such as real property, equipment leasing activities, and oil and gas ventures. See *Estate of Baron v. Commissioner*, 83 T.C. 542, 552 (1984), affd. 798 F.2d 65 (2d Cir. 1986).

[6] E.g., *Harmon v. Commissioner*, T.C. Memo. 1986-305; *Seely v. Commissioner*, T.C. Memo. 1986-216; *Holland v. Commissioner*, T.C. Memo. 1985-626, on appeal (9th Cir., July 18, 1986); *Watts v. Commissioner*, T.C. Memo. 1985-531; *Looney v. Commissioner*, T.C. Memo. 1985-326, on appeal (9th Cir., Mar. 28, 1986); *Cronin v. Commissioner*, T.C. Memo. 1985-83; *Snyder v. Commissioner*, T.C. Memo. 1985-9.

1983-619, affd. without published opinion 753 F.2d 1085 (9th Cir. 1985).

In any case where a taxpayer establishes a business purpose, i.e., an actual and honest profit objective, we may still recharacterize the terms of the transactions to accord with what we perceive to be the reality of the situation. See *Waddell v. Commissioner*, 86 T.C. 848, 902 (1986), and *Noonan v. Commissioner*, T.C. Memo. 1986-449 (Innovations/Inventions); *Tolwinsky v. Commissioner*, 86 T.C. 1009, 1040 (1986); *Law v. Commissioner*, 86 T.C. 1065, 1092 (1986); *Abramson v. Commissioner*, 86 T.C. 360, 374 (1986); *Sheid v. Commissioner*, T.C. Memo. 1985-402; and *Siegel v. Commissioner*, 78 T.C. 659 (1982) (Films).

While the subjective test is thus well founded in section 183, a unified approach emphasizing objective factors is preferable in cases involving generic tax shelters, i.e., those having the characteristics listed above at pages 412-413. First, because this approach emphasizes objective factors, it is more susceptible to consistent and predictable application. Second, because it does not require weighing the objective facts against a taxpayer's statement of his intent, it should be more understandable to taxpayers who doubt our ability to determine their subjective state of mind. Third, taxpayers similarly situated will be treated the same for tax purposes. Fourth, the test allows us to separate the real economic aspects from the "financial fantasies" surrounding a transaction and to apply the tax laws accordingly,[7] rather than to disallow all deductions (or limit them to gross income under section 183(b)(2), which in the typical case is zero). As applied below, the objective and subjective tests merge into an approach in which the objective test incorporates factors considered relevant in cases decided

---

[7] In *Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983), the Court of Appeals for the Seventh Circuit stated:

"The many elements of commercial surrealism present in these tax shelters should have put a reasonable person on notice that he was not being shown all the cards in the deck. It is unfortunate that in their haste to obtain tax deductions taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans.

"* * * The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future."

under section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48) in dispute in this case.

## Economic Substance

The record in this case, particularly in view of petitioners' post-acquisition activities, does not support the conclusion that petitioners' acquisition of Picasso packages was "a mere paper chase or otherwise fictitious." See *James v. Commissioner*, 87 T.C. 905 (1986). Compare *Falsetti v. Commissioner*, 85 T.C. 332 (1985), and *Moore v. Commissioner*, 85 T.C. 72 (1985). Nonetheless, the transactions will be disregarded if, applying the objective test, we find that they are devoid of economic substance consonant with their intended tax effects.

### 1. *The Dealings Between Jackie and Petitioners*

It is apparent from our findings of fact, which we will not repeat here, that the Picasso packages were sold by Jackie and purchased by petitioners as a tax shelter, without regard to the income that might be produced, the fair market value of the products, or the methods by which the products might be sold by petitioners. Based on the entire record, we conclude that petitioners engaged in the transaction primarily, if not exclusively, to obtain tax deductions and credits and thereby reduce the tax they would otherwise have to pay on their substantial income from other sources. See *Beck v. Commissioner*, 85 T.C. at 570-571; sec. 1.183-2(b)(8), Income Tax Regs.

Petitioners admit that tax considerations played a part in their decision to acquire the Picasso packages. Their adviser at the time of the initial acquisition was their tax accountant, whose records reflect that he considered his function to be advising petitioners with respect to "tax shelter." The information sought and received from Jackie focused primarily on the tax advantages to be obtained. Petitioners neither sought nor received prior to their acquisitions in December 1979 information on the manner in which they could commercially exploit the property that they were acquiring. At no time did they obtain any independent valuation information or distribution information, and they

never entered into distribution agreements with anyone. The evidence indicates that they were indifferent to the real value of the Picasso packages. Petitioners were totally unbusinesslike in their initial dealings with Jackie. See sec. 1.183-2(b)(1) and (2), Income Tax Regs.

Persuasive evidence of the lack of arm's-length price negotiation is petitioners' blind acceptance of the exaggerated values of the images claimed by Jackie. The evidence of value discussed below demonstrates that an inquiry would have readily shown that the claims of value that were made to petitioners before the first acquisitions could not be supported in fact. Although they had plenty of time in 1980, before the close of that tax year, to investigate these facts before making the second acquisition, they failed to do so. By the time of the second acquisition, the dispute between Paraselenes S.A. and VAGA was in full swing, and petitioners had not received the products that they had been promised in December 1979. Not surprisingly, they never did (and apparently never will) receive net income from the activity. See sec. 183-2(b)(1), (4), (6), and (7), Income Tax Regs.

We must acknowledge the existence of some evidence that Mrs. Rose made an effort to familiarize herself with the distribution prospects and that, after acquiring the Picasso packages, she became involved in art galleries. This evidence, however, is susceptible of various interpretations. One possibility is that, after being introduced to the Picasso packages, Mrs. Rose developed a bona fide interest in the art business. A second possibility is that these activities were undertaken primarily to protect the anticipated tax benefits of the acquisition, in accordance with the advice contained in Metry's December 19, 1979, note to Krauser. A third possibility is that Mrs. Rose, who was looking for activities to fill the time left because of the maturity of her children, was engaging in the activity in the nature of a "hobby." We are not persuaded, in any event, that the activities with respect to the art galleries prove that petitioners had an actual and honest profit objective at the time that they acquired any of the Picasso packages. Petitioners disposed of their interests in the galleries in 1983 (about the time of the statutory notice). The activities

of Mrs. Rose have not been shown to involve the time, effort, or expertise consonant with an actual profit objective. See sec. 1.183-2(b)(1), (2), (3), (5), and (9), Income Tax Regs.

## 2. *Relationship Between Sales Price and Fair Market Value*

Petitioners agreed to pay $550,000 for each Picasso package when, according to the best available evidence, the fair market value of the packages was negligible. We do not, however, rely on hindsight in the form of the opinions of respondent's experts in reaching the conclusion that the purchase price agreed to had no reasonable relationship to anything other than projected tax benefits.

The "Reproduction Masters" sold to petitioners as Picasso packages included the rights acquired the same month from Paraselenes S.A. for $10,000 plus 60 percent of the "gross receipts" received by Jackie to be applied against certain minimum guarantees. The guarantees would be, and were in fact, satisfied upon sale of 100 Picasso packages to purchasers and payment of $1 million to Paraselenes S.A. for 1979.

The appraisals of F.P. Rose and Rothschild sent to petitioners in 1980 did not explain the manner in which they arrived at values of $675,000 and $750,000, respectively. In attempting to support those appraisals at the time of trial in 1986, however, F.P. Rose projected the sale of 23,000 products of each image, at prices ranging from $12.50 for a poster to $2,000 for a signed and numbered print. Rothschild assumed sales of over 36,550 for each image, ranging from puzzles and calendars at $6.50 to tapestries at $4,000. Both F.P. Rose and Rothschild gave equivalent appraisals, and presumably made equivalent assumptions, for each of the Picasso packages sold by Jackie. Thus, the values that they asserted assumed the ability of investors such as petitioners to simultaneously sell literally millions of items. No expertise is necessary to recognize that such a volume of sales is improbable and, in any event, would have to be taken into account in establishing a price reflecting fair market value. See *Skripak v. Commissioner*, 84 T.C. 285, 324-325 (1985); *Estate of Baron*

*v. Commissioner*, 83 T.C. 542, 556 (n. 37) through 558 (1984), affd. 798 F.2d 65 (2d Cir. 1986).

Similarly, it is clear that F.P. Rose, Rothschild, and even respondent's expert, Cole, were speculating as to maximum potential revenue and not determining fair market value. Carolan similarly assumed that the products would sell, although she differentiated between maximum potential sales and probable gross revenues. As set forth in our findings of fact, we conclude that the opinions of F.P. Rose and Rothschild are not credible because they are unsupported by any independent evidence and can only be attributable to bias resulting from the contract between them and Jackie. See *Chiu v. Commissioner*, 84 T.C. 722, 730 (1985); *Fuchs v. Commissioner*, 83 T.C. 79, 99 (1984); *Dean v. Commissioner*, 83 T.C. 56, 75 (1984).

Except for the inherent difficulty in predicting sales of the items in question, we have no reason to reject the opinions of respondent's experts as to the maximum potential revenue to be realized from sales of products of the Picasso images purchased by petitioners. See *Snyder v. Commissioner*, 86 T.C. 567, 582-587 (1986); *Parker v. Commissioner*, 86 T.C. 547, 561-565 (1986). Whatever revenue might be realized, however, would not be instantaneous. Jackie, F.P. Rose, and Rothschild all assumed a minimum 10-year marketing period. Thus we conclude that the actual fair market value of the packages at the time of acquisition would be not more than the then present value of the future stream of income, which was negligible.

We do not believe that under these circumstances the $10,000 paid to Paraselenes S.A. is indicative of a minimum fair market value. That price was paid by Jackie on the assumption that Jackie would immediately resell the rights for a cash downpayment of $40,000 and production costs of $5,000, plus a promise to pay an additional $40,000 in a few months' time.

Through April 1980, petitioners paid a total of $85,000 cash in relation to each of the images acquired December 1979. On their 1979 tax return, due April 15, 1980, they claimed investment tax credit of $55,000, plus depreciation of almost $63,000 for each package, reducing income

taxable at rates exceeding 50 percent. As of that time, therefore, the tax savings exceeded the cash invested. It defies reason to suggest that the amounts paid by petitioners are indicative of fair market value of the Picasso packages without regard to the anticipated tax benefits. Mr. Rose testified that he thought he might achieve sales of "up to $2 million" and that—

A. It was $800 to $1,000 per print, because they were to be signed by Marina Picasso, and because there were to be only 500 of them in the country, and we felt like it was such a limited edition that they would command at approximately $1,000 each.

\* \* \* \* \* \* \*

Q. You mentioned that there was a price, an estimated price of the limited edition of $800; is that correct?

A. $800 to $1,000.

Q. Where did you get that information?

A. Because in—

Q. Where?

A. —Barron's article at the time, it had the lesser known artist that were bringing $500 and $600 and in articles like that, and from representations made by Mr. Metry and the others at the time.

These assumptions, of course, ignore the difference between prints actually made by the artist and the Picasso reproductions in question here. We do not believe, in any event, that a person with Mr. Rose's business acumen and experience would translate such speculation into a purchase price of $550,000. We do not believe that, absent the assurances that he requested and received concerning the anticipated tax benefits, Mr. Rose would have paid anything for the Picasso packages.

3. *Structure of the Financing*

As indicated above, the presence of deferred debt that is in substance or in fact not likely to be paid is an indicia of lack of or exaggeration of economic substance. See, e.g., *Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986); and *Estate of Baron v. Commissioner*, *supra* ("subjective test" cases); and see *Knetsch v. United States*, 364 U.S. 361 (1960); *Golsen v. Commissioner*, 54 T.C. 742, 753-754 (1970), affd. 445 F.2d 985 (10th Cir. 1971); *Karme v. Commissioner*, 73 T.C. 1163, 1186-1187 (1980), affd. 673 F.2d 1062 (9th Cir. 1982) ("objective test" cases). On the other hand, bona fide

third-party debt may indicate that a transaction, or at least part of it, should be recognized. See *Packard v. Commissioner*, 85 T.C. 397, 426-428 (1985).

In this case, written representations of Jackie and oral testimony of Finesod confirm that the partial recourse notes were used only for tax reasons, and that the recourse portion of the notes was specifically designed to be approximately equal to the tax deductions expected to be taken during the first two years of investment. In other words, petitioners were only agreeing to be personally liable for what they expected to get back shortly after filing their tax returns reporting the transactions. In substance, therefore, prior to the due dates of the deferred notes only the public treasury was out of pocket for the amount of cash actually paid by petitioners. The balance of the debt, including interest, was subject to a contingency of actual sales of products by petitioners.

The nonrecourse debt in this case was not likely to be paid because the revenues from which it would be paid were not likely to be received. Payment of the face amount of the recourse portion of the 1980 deferred note was uncertain because of the provision that the appraised value of the property at the time of default would be applied against the so-called recourse amount before personal liability could be enforced. In any event, the interest was nonrecourse and not likely to be paid. Thus the present worth of the recourse portion of notes made in 1979 and 1980 and payable in 1991 and 1994, respectively, was a fraction of their face amounts. We express no opinion on the tax consequences of the actual payment of the notes on their respective due dates. As of the time of the transactions in issue, however, it is apparent that the face amount of deferred debt is not reflective of true economic obligations of petitioners.

A fortiori, the interest is too unlikely to be paid to be deducted on an accrual basis. See sec. 1.461-1(a)(2), Income Tax Regs.; *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir.), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir.), affd. without published opinion sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734

F.2d 5-7, 9 (3d Cir. 1984); see also *Vastola v. Commissioner*, 84 T.C. 969, 977 (1985).

### 4. *Perceived Congressional Intent*

Petitioners suggest that they were merely taking advantage of tax incentives created by Congress. Indeed, Congress created deductions and investment tax credits to encourage certain types of activities, and the taxpayers who engage in those activities are entitled to the attendant benefits. See, e.g., *Leahy v. Commissioner*, 87 T.C. 56, 72 (1986); *Estate of Thomas v. Commissioner*, 84 T.C. 412, 433-440 (1985). Such congressional intent is readily demonstrated with respect to identifiable tangible property, such as that involved in *Estate of Thomas* and *Leahy*, or property dealt with by specific statutes, such as film or videotapes. See, e.g., *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. 255, 268-270 (1985), affd. 784 F.2d 66 (2d Cir. 1986), and *Apis Productions, Inc. v. Commissioner*, 86 T.C. 1192 (1986). When available, expressions of congressional intent will, of course, control. See *Glass v. Commissioner*, 86 T.C. 1087, 1164-1169 (1986); *Miller v. Commissioner*, 84 T.C. 827 (1985), on appeal (10th Cir. 1985); and *Fox v. Commissioner*, 82 T.C. 1001, 1021 (1984) (involving losses claimed under section 165).[8] Thus, although arrangements involving films may have the characteristics of generic tax shelters, we do not doubt that the property qualifies for depreciation and investment tax credits if other conditions are met.

Petitioners argue that the transparency is a depreciable asset comparable to the film master negatives in *Walt Disney Productions v. United States*, 549 F.2d 576 (9th Cir. 1976). As in *Reali v. Commissioner*, T.C. Memo. 1984-427, however, "We need not grapple with the rather metaphysical questions posed by * * * [petitioners' analogy]." Although our resolution of this case on the dispositive issue makes it unnecessary for us to decide what, if any, depreciable asset petitioners were to acquire or when such asset was placed in service, our view of the facts and our perception of congressional intent are inseparable from the

---

[8] See also *Johnson v. United States*, 11 Cl. Ct. 17 (1986); Cordes & Galper, "Tax Shelter Activity: Lessons From Twenty Years of Evidence," 38 National Tax J. 305, 308, 322 (1985).

concepts attendant to the depreciation deduction. Petitioners have not persuaded us that the inexpensive photographic transparency to which Jackie attributed over 99 percent of the purchase price of its packages is anything more than an intermediate part of a final depreciable asset, i.e., the printing plate that must be pressed against paper to make the reproduction print or other ultimate product to be sold. It seems to us more consistent with the recognized concept of "placed in service" that the final printing plate must be ready and available for use before depreciation deductions may begin. The transparency is merely a part of the capitalized cost of the printing plate, and it is the use of that printing plate that actually coincides with exhaustion, wear and tear, or obsolescence—the predicate for depreciation under section 167(a). See *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 14 (1974).

We are not at all persuaded that Congress intended to encourage activities such as the Jackie program, which, if successful, would at most flood the market with mass-produced reproductions that, according to respondent's expert Cole, would merely denigrate the fine print art market. There is no evidence or reason to believe that the activities engaged in by Jackie and by petitioners in this case are among those favored by Congress. To the contrary, as discussed below in our discussion of section 6621(d), it appears that the transactions in issue are in the category of those that lead to adverse congressional action.[9]

The nature of the dealings between the parties, the total disparity between the purchase price and the fair market value of the property acquired by petitioners, and the illusory nature of the financing of the transactions convince us that petitioners' acquisition of Picasso packages from Jackie is devoid of economic substance. The transactions, therefore, do not give rise to any depreciation deductions, miscellaneous deductions, or investment tax credits.

---

[9]Overvalued lithographs acquired in tax shelter promotions and donated to charities have led to negative congressional response. See Explanation of the Senate Finance Committee, p. 444, of changes to sec. 6659 made by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 693.

## Interest Paid on Recourse Debt

As indicated above, the Court of Appeals for the Fourth Circuit reversed our decision in *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983), because section 163 "does not limit deductibility of installment interest expense depending upon the item purchased by the taxpayer." The Court of Appeals distinguished *Knetsch v. United States*, 364 U.S. 361 (1960), and *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), on the ground that:

> For this reason, Rice's recourse note is fundamentally different from the nonrecourse notes held not to constitute genuine debt in cases such as *Hilton*, 74 T.C. at 364. Moreover, *Knetsch*, 364 U.S. at 362-65, 81 S.Ct. at 133-34, does not suggest that the debt represented by the note was not genuine because Rice did not borrow his own money to create interest expense as, in effect, did the taxpayer in *Knetsch*. *See also Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966); *Bridges [v. Commissioner]*, 325 F.2d [180], at 184 [(4th Cir. 1963)]. [Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96.]

After reconsideration of our position, we believe that the distinction made by the Court of Appeals is valid to the extent that petitioners actually incurred a debt to Jackie that was certain to be paid within a short period of time, i.e., the short-term notes due in April 1980 arising out of the December 1979 acquisitions. Even if the notes themselves do not give rise to tax deductions because they were payments for anticipated tax benefits, the interest actually paid on those notes is deductible under section 163. In this regard, it is pertinent that section 183(b) specifically acknowledges the deductibility of interest incurred in transactions that do not otherwise give rise to tax deductions. In other words, the requirement of a profit objective is not one of the limitations in section 163 on the deduction of interest actually paid. The evidence in this case supports the conclusion that $1,706 was paid for the forbearance of the $40,000 from December 1979 to April 1980, and, following the opinion of the Court of Appeals for the Fourth Circuit in *Rice's Toyota*, that amount is deductible as interest under section 163. We emphasize, however, that this limited allowance of a deduction is based on the record and respondent's concession in this case and does not reopen

questions of deductibility of interest where there is no actual payment of interest attributable to the forbearance of amounts due on genuine indebtedness.

### *Additional Interest Under Section 6621(d)*

## Section 6621(d) provides as follows:

SEC. 6621(d). INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—

(1) IN GENERAL.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b).

(2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS—For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributed exceeds $1,000.

(3) TAX MOTIVATED TRANSACTIONS.—

(A) IN GENERAL.—For purposes of this subsection, the term "tax motivated transaction" means—

(i) any valuation overstatement (within the meaning of section 6659(c)),

(ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

(iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and

(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period.

(B) REGULATORY AUTHORITY.—The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account—

(i) the ratio of tax benefits to cash invested,

(ii) the methods of promoting the use of this type of transaction, and

(iii) other relevant considerations.

(C) EFFECTIVE DATE FOR REGULATIONS.—Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed.

(4) JURISDICTION OF TAX COURT.—In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions.

Respondent's amendment to the answer claims additional interest under section 6621(d) on portions of the deficiency attributable to deductions disallowed because of a valuation overstatement, a determination that petitioners were not "at risk" for more than the amount of their cash investment, and/or a determination that petitioners did not enter into the transactions in issue for profit. Respondent did not claim interest on the portion of the deficiency attributable to the investment tax credits in question.

In *Johnson v. Commissioner*, 85 T.C. 469, 483 (1985), we determined that additional interest under section 6621(d) was due, on our own motion, stating:

In connection with the enactment of this provision, the Conference Committee stated that:

The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court. * * * The Court should * * * *assert, without hesitancy* in appropriate instances, the penalties that the Congress has provided. [H. Rept. 98-861 (Conf.) (1984), 1984-3 C.B. (Vol. 2) 239. Emphasis added.]

As in *Johnson*, we conclude that the circumstances of this case are among those in which Congress intended us to "assert, without hesitancy" the sanctions of section 6621(d). This is particularly true to the extent that tax-motivated transactions giving rise to additional interest under section 6621(d) include "any valuation overstatement (within the meaning of section 6659(c))." Section 6659(c) provides as follows:

SEC. 6659(c). VALUATION OVERSTATEMENT DEFINED.—

(1) IN GENERAL.—For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, *claimed on any return* is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). [Emphasis supplied.]

(Section 6659 was amended by the Deficit Reduction Act of 1984, section 155(c)(1)(A), Pub. L. 98-369, 98 Stat. 494, 693, to delete former section 6659(c)(2) and renumber as section 6659(c) the above provision, effective for returns filed after December 31, 1984.)

Under section 6659(c), there is a valuation overstatement if the adjusted basis of any property claimed on any return is 150 percent or more of the amount determined to be the correct adjusted basis. In their returns in issue, petitioners claimed an adjusted basis of $550,000 for each Picasso package. Because we have found that the transaction is devoid of economic substance and is to be disregarded for tax purposes, petitioners have no "adjusted basis" for depreciation or investment tax credit purposes. Their correct adjusted basis, therefore, is zero. See Zirker v. Commissioner, 87 T.C. 970 (1986).

To the extent that his claim for additional interest is based on disallowance of depreciation because of a valuation overstatement, respondent's burden of proof has been satisfied. Respondent is entitled to additional interest under section 6621(d) after December 31, 1984, on the portion of the deficiency for each year resulting from disallowed depreciation. See *Solowiejczyk v. Commissioner*, 85 T.C. 552, 555 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Because respondent has not made claim for additional interest on the portion of the deficiency attributable to disallowed investment tax credits, the additional interest will not apply to those amounts.

Interest accrued but unpaid has been disallowed in this case because the notes to which the interest related were part of a transaction without economic substance, and conditions for accrual have not been met. Miscellaneous deductions claimed by petitioners are also disallowed because they related to a transaction without economic substance and not to an activity for which deductions are allowable under section 162 or 212. The portion of the deficiency attributable to these items, however, is not affected by our determination of a valuation overstatement. See *Zirker v. Commissioner*, 87 T.C. at 980. The disallowed amounts of interest and miscellaneous deductions are less than petitioners' cash investment, so it is not certain that

the deficiencies attributable to these items are disallowable by reason of section 465(a). See sec. 6621(d)(3)(A)(ii). Respondent's burden thus has not been satisfied as to these items. Because respondent has suggested no other ground on which section 6621(d) applies to the portion of the deficiency for 1980 attributable to disallowed interest, that amount accrues interest only at the normal rate.

Respondent's final ground for assertion of additional interest under section 6621(d) is that the losses were disallowed pursuant to section 183 because petitioners did not enter into the transactions for profit. Temporary Regulations adopted on December 26, 1984, pursuant to section 6621(d)(3)(B), and stated to be applicable to interest accruing after December 31, 1984, state that "Any deduction disallowed for any period under section 183" is subject to the provision for additional interest set forth in section 6621(d). Sec. 301.6621-2T, A-4(1), Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 59394 (Dec. 28, 1984). These Temporary Regulations were adopted under the authority of section 6621(d)(3)(B). The evidence is overwhelming that the miscellaneous deductions in issue here are "tax motivated"; and application of the Temporary Regulations to the deficiencies attributable to disallowance of these deductions is consistent with the express provisions and implicit policy of section 6621(d). Respondent is therefore entitled to additional interest after December 31, 1984, on the portion of the deficiency for 1980 attributable to the disallowed miscellaneous deductions.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, HAMBLEN, CLAPP, SWIFT, JACOBS, WRIGHT, and WELLS, *JJ.*, agree with this opinion.

SHIELDS, GERBER, PARR, and WILLIAMS, *JJ.*, did not participate in the consideration of this case.