BENTLEY A. HOLLANDER AND CLARA B. HOLLANDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hollander v. Commissioner
Docket Nos. 19678-85; 36125-86.
United States Tax Court
T.C. Memo 1989-163; 1989 Tax Ct. Memo LEXIS 163; 57 T.C.M. (CCH) 96; T.C.M. (RIA) 89163; April 13, 1989; As amended April 17, 1989 David A. Schmudde and Martin M. Shenkman, for the petitioners. Frank Agostino, C. Ellen Pilsecker, Matthew Magnone and Patrick E. Whelan, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1980 and 1981 in the amounts of $ 31,232.25 and $ 43,091, *165 respectively. The issues for decision are: 1) whether the motion picture partnership "Hearts Associates" transaction lacked economic substance; 2) whether the partnership purchased the motion picture "Second Hand Hearts;" 3) whether the partnership can include the nonrecourse purchase note in basis; 4) whether petitioners' investment is subject to the limitations of section 465; [1] 5) whether the partnership is entitled to use the declining balance method of depreciation; 6) whether the partnership is entitled to miscellaneous deductions claimed on its 1980 and 1981 returns; 7) whether the partnership is entitled to an investment tax credit with respect to its investment in "Second Hand Hearts"; and 8) whether petitioners are liable for the interest addition to tax provided by section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners, *166 Bentley A. and Clara B. Hollander, were residents of Cherry Hill, New Jersey at the time they filed their petition. Petitioners filed their Federal income tax returns for the taxable years ending December 31, 1980 and December 31, 1981, with the Brookhaven Service Center. All references to petitioner will be to Bentley A. Hollander. Petitioner became a limited partner in Hearts Associates, a New York limited partnership, by subscribing for a one-half unit of a limited partnership interest. Hearts Associates was formed in November 1980 to acquire, own and exploit world-wide rights in a feature-length theatrical motion picture entitled "Second Hand Hearts" from its producer, Lorimar Productions Co., Inc. (Lorimar) "Second Hand Hearts" is an English language feature length drama of personal relationships, depicting the story of the stormy romance and marriage of the two protagonists. The cast includes Robert Blake, Barbara Harris and Sondra Blake. The picture was directed by Hal Ashby, produced by James William Guercio and based upon a script by Charles Eastman. Hal Ashby has previously directed "Coming Home," "Being There," "Shampoo," "Harold and Maude" and "Bound for Glory. *167 " It was anticipated the film would be released in December 1980. The general partners of Hearts Associates were Ira N. Smith, Stephan R. Greenwald and Morton A. Gross. All three are attorneys, and the confidential private placement memorandum (placement memorandum) commented that each "had limited experience in managing partnerships that own motion pictures and have had limited experience in rendering legal advice to partnerships with respect to motion picture matters." The partnership units were being offered for sale by the partnership through LPS Securities, Inc., which was wholly owned by the general partner, Stephan Greenwald. The units were being offered on a best efforts basis to a select group of investors who met the suitability standards set forth under the category in the placement memorandum entitled "Who Should Invest." LPS Securities, Inc. would receive a due diligence fee of $ 5,000, plus 10 percent of the offering price of the units actually placed by such broker-dealer. The placement memorandum dated December 13, 1980, stated that 20 units of partnership interests were available at $ 112,250 per unit. The capital contributions of the limited partners would be *168 due as follows: Per Unit
For 20 Units
Cash on the date of executing
$  22,750
$   455,000
their subscriptions (together
with promissory notes
evidencing the subsequent
annual installments)
On April 15, 1981
47,750
955,000
On January 15, 1982
41,750
835,000
$ 112,250
$ 2,245,000
The proceeds from sales of the partnership units were to be utilized as follows: Percent of Gross
Proceeds from
Amount
Sale of Units
GROSS PROCEEDS FROM SALE
OF UNITS
[2] $ 2,250,000
100.0%
LESS: Offering Expenses
including selling
commissions, legal
fees and disburse-
ments
$   274,500
12.2%
NET PROCEEDS FROM SALE
OF UNITS
$ 1,975,500
87.8%
Use of Net Proceeds
General Partners' Fee (1)
$   185,500
8.2%
Net Interest Expense on
Additional Financing (2)
60,000
2.7%
Cash Payment for
Picture
200,000
8.9%
Marketing Costs
1,300,000
57.8%
Marketing Consultant
Fee (3)
225,000
10.0%
Working Capital
5,000
.2%
$ 1,975,500
87.8%
*169 (1) Payable $ 5,500 in 1980 and $ 180,000 in 1981. (2) To the extent all or a portion of this amount is not utilized for interest costs, it will be retained as additional working capital. (3) Payable to R. A. Inbows, Ltd., an affiliate of Ira N. Smith, one of the General Partners, in consideration for consultant services to be rendered to the Partnership in connection with the release, distribution and marketing of the Picture, particularly in the exercise of the Partnership's rights of consultation under the Distribution Agreement. The following is a more detailed summary of the compensation to be paid to the general partners and certain others in connection with this transaction. ENTITY RECEIVING
ESTIMATED
COMPENSATION
TYPE OF COMPENSATION
AMOUNT
Offering Stage
LPS Securities, Inc.,
Due Diligence Fee of $ 5,000
Uncertain
an Affiliate of
plus 10% of offering price of
Stephen R. Green-
any Units sold by it
wald, a General
Partner
Operating Stage
General Partners
Management Fee
$ 185,500(1)
Present and continuing 1%
Uncertain
interest in profits and
losses
(1) Payable $ 5,500 in 1980 and $ 180,000 in 1981.
Liquidation Stage
General Partners
Return of Capital Contri-
$   5,000
bution after Limited Partners
receive their aggregate
Capital Contributions
1% interest in balance of
Uncertain
proceeds after Limited Partners
receive their aggregate Capital
Contributions and General Partners
receive their Capital Contributions
Compensation to Others
R. A. Inbows, Ltd.,
Marketing Consultant Fee
$ 225,000
an affiliate of
Ira N. Smith, a
General Partner
*170 The placement memorandum indicated that investment in the partnership might not be suitable for investors whose marginal income bracket was less than 50 percent. The partnership adopted as a general suitability standard the following requirements: (a) He is acquiring the Units for investment and not with a view to resale or distribution; (b) he can bear the economic risk of losing his entire investment; (c) he has a net worth of at least $ 300,000 multiplied by the number of Units to be purchased by him in the Partnership * * * and anticipates he will continue to have in the future, annual taxable income, some portion of which will be subject to a Federal income tax rate of at least 50% after taking into consideration any losses which may result from this investment; (d) his overall commitment to investments which are not readily marketable is not disproportionate to his net worth, and his investment in the Units will not cause such overall commitment to become excessive; * * * (f) he * * * have [sic] such knowledge and experience in financial and business matters that he is * * * capable of calculating the merits and risks of this investment. Each investor was *171 required to represent in writing the satisfaction of the foregoing requirements. Pursuant to the confidential placement memorandum, the partnership was expected to acquire "Second Hand Hearts" from Lorimar for a purchase price of $ 7 million, of which $ 200,000 would be payable in cash at the closing, $ 4,650,000 would be evidenced by a recourse purchase note and $ 2,150,000 would be evidenced by a nonrecourse purchase note. The recourse purchase note and the nonrecourse purchase note each bore nonrecourse interest at the rate of 10 percent per annum and matured on January 10, 1992. The maturity date on the purchase notes could be extended until January 10, 1997, if the distributor failed to spend, or cause to be spent, at least $ 5,300,000 in advertising on the picture in the United States and Canada through December 31, 1985 (including $ 1,300,000 provided by the partnership). Each limited partner was required to assume the primary obligation to pay up to 4.95 percent of the principal amount of, but not interest on, the recourse purchase note, equalling a maximum liability of $ 230,175 per unit. No such assumption agreement is part of the record. The partnership would grant *172 Lorimar, the producer, a purchase money security interest in the picture and certain proceeds from its exploitation. The purchase notes, including interest thereon, would be payable prior to maturity only from a portion of the partnership's share of gross receipts derived from exploitation of the movie. Unpaid interest would not accrue interest. For the $ 7 million, the partnership would acquire title to and all rights in the picture in perpetuity throughout the world and in all media including theatrical, nontheatrical and television rights, subject to the distribution agreement with distributor, and television agreement, various subdistribution agreements and the reservation by the producer of certain ancillary rights including remake, sequel, made-for-television motion picture and series rights. In addition, the partnership would acquire various physical materials, including a picture negative, a print and necessary sound track material. The partnership's share of gross receipts or, where applicable, net profits, derived from the exploitation of the movie, was determined as follows: 1. PARTNERSHIP'S SHARE OF GROSS RECEIPTS
Partnership's Percentage of
Partnership's Share of
Gross Receipts
Gross Receipts
12-1/2%
0     - $  7,200,000 =
$   900,000   95%
7,200,000 -   15,442,500 =
$ 7,830,375   12-1/2%
15,442,501 -   15,750,000 =
38,437.50
6%
over $ 15,750,000 (or 100% of Net Profits,
whichever is greater)
*173 (b) U.S. and Canadian Television
The Partnership will be entitled to 12-1/2% of the first $ 2,250,000 of proceeds derived from the licensing of the Picture for use on television, including cable television and syndicated television in the United States and Canada (collectively the "TV Proceeds"), subject to the deductions generally applicable to TV Proceeds derived from the exploitation of the Picture. Any TV Proceeds in excess of $ 2,250,000 will be included in Gross Receipts from U.S. and Canadian theatrical distribution and the Partnership will be entitled to those percentages set forth under (a) above. With respect to the first $ 2,250,000 of TV Proceeds, to the extent that TV Proceeds remain after payment of the Partnership's share, and after adding back costs related to such proceeds and normally deducted in computing TV Proceeds, the Partnership will be entitled to be paid, in 1989 through 1992, an amount equal to the lesser of (i) such remaining TV Proceeds or (ii) the excess, if any, of $ 2,250,000 over the amount paid to or earned by the Partnership as cash distributions through December 31, 1987 from theatrical and nontheatrical distribution. (c) Foreign Theatrical *174 and Television
20% of Gross Receipts against a minimum guaranteed amount of $ 3,350,000 payable on July 15, 1981, subject to an option on the part of Distributor to convert such interest to 100% of Foreign Net Profits with no minimum guarantee. The option must be exercised by Distributor prior to June 30, 1981. "Foreign Net profits" is defined as Gross Receipts from foreign theatrical distribution, less distribution fees to Distributor equal to 50% of gross receipts and after recoupment of all distribution expenses, profit participations, residuals, recoupment of negative cost and payments to the Partnership for interest. The placement memorandum also listed a 14-page summary of the risk factors associated with the investment prepared by Laventhal & Horwath, accountants for the partnership. These included tax risks, operating risks and investment risks. The tax risks included risk of audit and disallowance of partnership deductions; partnership status; status of the partnership as the sole owner of the picture and the relationship with the producer, distributor and subdistributors; transactions entered into for profit; deductibility of losses limited the amount "at risk; *175 " partnership deductions; depreciation of the picture; deferral of income under the distribution agreement and disposition of the picture or partnership interests. Operating risks included competition in the motion picture industry; limited partners' letters of credit and other collateral; the distribution agreement: partnership funds at risk of credit of distributor; the subdistribution agreements; foreclosure; and limited cash flow. Finally, investment risks included restrictions on transfer, no offset to payment of capital contributions, default by limited partner, conflicts of interest, liability of limited partners, and no right to manage. The placement memorandum included a 23-page section dealing with Federal, state and local tax consequences prepared by the special counsel to the partnership, Carro, Spanbock, Londin, Fass & Geller and Laventhal & Horwath. Additionally, a 41-page tax opinion by Laventhal & Horwath was made available to the investors. Laventhal & Horwath also prepared a set of financial projections for Hearts Associates on December 11, 1980. Each set prepared, among other things, projected taxable income and loss from 1980 to 1992, projected cash flow from *176 1980 to 1992 and projected after tax benefits for an $ 112,250 investor limited partnership interest in the 60- and 70-percent tax brackets from 1980 to 1992. The projections were based on estimates and assumptions provided by Hearts Associates and Laventhal & Horwath did not represent them as results that would actually be achieved. By means of a purchase and sale agreement dated December 30, 1980, the partnership purported to purchase "Second Hand Hearts" for $ 7 million from Lorimar. The record contains no evidence that a cash payment was made. At the same time the partnership purchased "Second Hand Hearts," the partnership was obligated to enter into a distribution agreement with Lorimar Distribution International, Inc. (Lorimar Distribution). Lorimar Distribution was a wholly owned subsidiary of Lorimar on December 30, 1980. By letter dated December 30, 1980, Lorimar, Lorimar Distribution and Hearts Associates acknowledged that the purchase and sale agreement would not be executed unless the distribution agreement was executed simultaneously and vice versa. On December 30, 1980, Hearts Associates and Lorimar Distribution entered into an agreement whereby Lorimar Distribution *177 agreed to distribute the picture for Hearts Associates. In the purchase and sale agreement, Lorimar reserved certain rights in and to the picture, including remake and sequel rights, all rights to stage productions, merchandising and literary rights. Obligations to pay the following third-party participants were incurred prior to the purported sale of the picture to the partnership and were binding upon the partnership: Third Party Participations
Caribou Film Co.
30% of 100%
(Robert Blake and James W.
of net profits
Guercio, Joint Venture
Robert Blake, individually
5% of first $ 4,000,000 of
gross break-even [sic]
after break-even, 7-1/2%
of next $ 4,000,000 after
breakdown, 10% thereafter
James Guercio, individually
$ 50,000 deferment
Hal Ashby
50% of net, less the
share payable to
Caribou
Lorimar Productions, Inc.
20% of 100% gross
receipts
The partnership granted Lorimar a security interest in the picture as collateral security for full payment of the purchase price, together with interest on the purchase note. The partnership was not entitled to "sell, hypothecate, encumber or otherwise dispose of the copyright in *178 and to the Picture, the negative thereof or any of the rights associated with or relating to the Picture" without the prior written approval of Lorimar. The initial term of the distribution agreement was 10 years from the date of the agreement. Pursuant to the distribution agreement, the partnership conveyed to Lorimar Distribution "the sole, exclusive and irrevocable right throughout the world to advertise, publicize and exploit and to cause to be advertised, publicized and exploited, the Picture in such manner and through such means and media whatsoever as [Lorimar] may determine." Lorimar Distribution was given the option to extend the term of the agreement in perpetuity. Absent notice given by Lorimar Distribution to the partnership, Lorimar Distribution was deemed to exercise its option to extend the distribution agreement. Lorimar Distribution was obligated to pay a fee to exercise its options to extend the agreement only if the partnership notified Lorimar Distribution in writing that the exercise price was due and owing. Also, pursuant to the distribution agreement, the distributor was to have the "sole, exclusive and complete control (without hindrance by Producer *179 or any third person) over the leasing, licensing, exploiting, marketing and distribution of the Picture." Lorimar Distribution was also entitled to transfer or assign the distribution agreement. The distribution agreement also provided that registration of the United States' copyright in the picture should be in the name of Lorimar Productions, as trustee for Hearts Associates, and that Lorimar Distribution would maintain the copyright notice of all prints of the picture. Lorimar could, in the name of Hearts Associates or otherwise, "take such steps as * * * necessary or appropriate by action at law, or otherwise, to prevent any impairment of, encumbrance on, or infringement upon the rights of Producer [Hearts Associates] or Distributor." Additionally, under the distribution agreement, the distributor or its licensees could "cut, recut, edit, re-edit, dub, redub, add to, subtract from, shorten, lengthen or otherwise modify or change the Picture and its title to the extent deemed necessary by [Lorimar Distribution] in its sole judgment for any and all purposes whatsoever." The distribution fee to be obtained by Lorimar Distribution was partially defined in terms of net profits. *180 The definition of net profits utilized in the distribution agreement permitted Lorimar Distribution to deduct the negative cost of the movie more than three times before paying any amount to the partnership. "Second Hand Hearts," therefore, would have to generate domestic gross receipts in excess of $ 24,500,000 plus interest before there would be any dollar of net proceeds payable to the partnership. The distribution agreement provided for payment to the partnership of the following percentages of domestic gross proceeds: (a) 12-1/2 percent of the first $ 18 million and (b) the greater of 6 percent of United States gross proceeds or 100 percent of United States net proceeds. The partnership was to receive domestic gross theatrical proceeds sufficient to repay the purchase notes. The partnership was to receive certain foreign proceeds from the exploitation of the picture. Lorimar had the option, however, to provide the partnership with either a percentage of domestic gross profits or foreign net proceeds. Although the distributor was to retain monies purportedly belonging to the partnership as part of its general corporate funds until 1992, no financial information was requested *181 from the distributor. The placement memorandum commented that: Both Producer and Distributor are privately-owned companies, and neither makes its financial information publicly available. Accordingly, no representations are or can be made concerning the financial status of either Producer or Distributor. Each investor should note in this regard that certain portions of the proceeds from the exploitation of the Picture to which the Partnership may become entitled will be retained by Distributor as part of its general corporate funds, without being segregated and without being subject to a security interest, until 1988 through 1992, and will remain at the risk of the credit of Distributor until such amounts are actually remitted to the Partnership. The funds retained by the distributor were, therefore, to be unsecured and not to be segregated in any way. The distribution agreement provided also for the retention by Lorimar Distribution of licensing fees due to the partnership until as late as 1992. The partnership was also obligated to provide Lorimar the nonrefundable amount of $ 1,300,000 for the marketing of "Second Hand Hearts" pursuant to the distribution agreement. *182 Lorimar was not obligated to utilize these funds to market the picture. Also in connection with the advertising of the movie, on December 13, 1980, the partnership executed its distribution consulting services agreement with R. A. Inbows, pursuant to which R. A. Inbows was to exercise certain consultation rights on behalf of the partnership for a fee of $ 225,000. The memorandum indicated that the officers and directors of R. A. Inbows, a subsidiary of the general partner, had "limited experience in the marketing of motion pictures." The memorandum also stated that the distributor, Lorimar, had already been granted exclusive world-wide distribution rights to all films produced by the producer, Lorimar. The memorandum also stated that under the terms of the distribution agreement, "distributor will * * * have, in effect, absolute control over the exploitation of the Picture." As of October 10, 1981, "Second Hand Hearts" had generated $ 1,453,799 in United States gross receipts, of which $ 1,250,000 was attributable to network television. [3] While a motion picture may generate gross receipts for an indefinite period, the parties agree that the useful life of a motion picture is *183 generally 3 to 5 years, and that a motion picture generally generates most of its theatrical gross receipts within that same time. There are instances, however, when a picture's useful life is less than 3 years. As of December 30, 1980, the date of the purchase and sale transaction, Lorimar Distribution did not have an agreement with a subdistributor to exhibit the film with a nationwide movie distribution network. However, the distributor expected to initially release the film in two theatres in 1980, with wider distribution to follow in 1981. OPINION The first issue for decision is whether the movie partnership transaction lacked economic substance. Petitioner initially argued the issue of profit objective in terms of the test of section 183.[4] However, in Rose v. Commissioner,88 T.C. 386, 414 (1987), *184 affd.    F.2d    (6th Cir., February 27, 1989), we adopted a unified approach under which transactions involving "generic tax shelters," [5] are disregarded if they are devoid of economic substance. Respondent presented his arguments under the Rose analysis. In the case of a generic tax shelter, "the presence or absence of a profit objective is to be determined from the examination of certain objective factors which tend to indicate whether or not the disputed transaction had economic substance." See Horn v. Commissioner,90 T.C. 908, 933 (1988); Rose v. Commissioner, supra at 414. [6] This approach incorporates several of the factors found relevant under section 183. Under the Rose analysis, "the objective and subjective merge into an approach in which the objective test incorporates factors considered relevant in cases decided under section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48)." Rose v. Commissioner,88 T.C. at 414-415. *185 Under the unified approach of Rose,the following factors have been considered in determining whether an activity is lacking in economic substance: 1) the lack of arm's-length dealings; 2) petitioner's investment activities; 3) projected revenues versus tax benefits; 4) the relationship between fair market value and price; and 5) the structure of the financing. See Patin v. Commissioner,88 T.C. 1086, 1117-1122 (1987), affd. sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F-2d 93 (9th Cir. 1989), affd. sub nom. Gromberg v. Commissioner,    F.2d    (6th Cir. 1989); Rose v. Commissioner,88 T.C. at 415-422. For our purposes, we will focus on those factors which we find relevant to the facts of this case to determine whether there was economic substance to the transaction. Petitioner asserts that the evidence in this case clearly establishes that he acquired the movie with the objective of making a profit. Petitioner contends that the partnership *186 acquired a feature-length motion picture for commercial exhibition and exploitation. The picture was produced by a reputable and well-established motion picture company, written by an experienced screenwriter, and featured actors who recently appeared in other motion pictures. Moreover, in his reply brief he argued that the factors in Rose are wholly inapplicable. Respondent, on the other hand, contends that the objective facts surrounding the transaction show otherwise and highlights the lack of any negotiations with respect to the purchase price, the failure of the partnership to obtain an appraisal of the film or verify production costs, the passive nature of the partnership's involvement with the distribution of the film and the nature of the debt used to pay for the film. These factors suggest that the partnership's transaction lacked economic substance, and, other than the generated tax benefits, offered no business purpose. The profit objective issue is one to be determined at the partnership level. See Brannen v. Commissioner,78 T.C. 471, 502 -505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Weighing what relevant facts we have on record, *187 we find that the Hearts Associates' motion picture related investment was not engaged in for profit and lacked economic substance. The record highlights that the partnership was indifferent to whether or not it made an economic profit. See Beck v. Commissioner,85 T.C. 557, 569 (1985), and Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). While the picture was directed and written by respected individuals in the motion picture community, the partnership relinquished all control over the distribution of the movie, despite the fact that no assurance was provided for adequate distribution of the film, which is critical to a picture's ability to generate sufficient proceeds to return initial production costs and produce any profits. The distribution agreement, in fact, transferred all the basic rights associated with the copyright to Lorimar leaving Hearts Associates with a mere "bare copyright." [7] Lorimar Distribution reserved remake and sequel rights, theatrical stage rights, all merchandising revenues, book publishing rights and all series in television and radio rights for its own accounts. *188 Additionally, Lorimar Distribution obtained complete control over the exploitation of the picture. Lorimar Distribution alone was authorized to edit, retitle, advertise, distribute or sell the picture. By means of the distribution agreement, Lorimar Distribution, and hence, Lorimar, regained virtually every right it allegedly transferred to the partnership under the purchase agreement, and Hearts Associates could not be involved in any manner in the activity in question. Hearts Associates' sole investment activity was a financial participation in the partnership. The partnership's alleged involvement in the "marketing" end of the film is highly doubtful. The partnership allegedly committed $ 1.3 million for marketing costs and an additional $ 225,000 to R. A. Inbows, owned by the general partners, to assure proper advertising, marketing and to monitor the distribution effort on behalf of the partnership, of which no portion was refundable. The record, however, is devoid of any evidence of the release of the movie (other than a statement in the offering memorandum indicating a planned 1980 release in *189 two theaters) or any effort by R. A. Inbows (whose directors and officers admittedly had limited motion picture marketing experience) to be involved in the distribution of the film on behalf of the partnership. In fact, from the record it is evident that the partnership had no say in the marketing or distribution of the film, and petitioner provided no evidence to contradict this. Moreover, if the film were released by December 30, 1980, as planned, there was virtually no time to advertise in any case. The limited period of time between the date the partnership entered the deal and the alleged release of the film makes it highly unlikely that any funds were used to promote the movie, and if they were, at too late a time to make a difference. What evidence is in the record supports respondent's argument that the activities were entered into only for the substantial tax losses and various other deductions generated by the investment. The fate of the film's success was at all times in the hands of others. The record furthermore contains no evidence surrounding the purchase of the film or the negotiation of the purchase price of the film, and no partnership books and records are in *190 evidence. Thus, we can only conclude that the partnership took the deal exactly as presented by Lorimar, including an agreement to relinquish any control over the promotion of the film. This indicates a total lack of arm's-length dealings. Finally, another factor to be considered is the structure of the financing. The purchase price was to be paid by "recourse" and nonrecourse obligations secured only by the film and its proceeds. Of the $ 7 million price, $ 2,150,000 was attributable to a nonrecourse purchase note. The $ 4,650,000 purchase note, while labelled "recourse," was also, however, to be covered by Lorimar from film proceeds until maturity in 1992, with a possible extension until 1997, if certain advertising funds were not spent, a likely possibility under the circumstances. Thus, this "recourse" financing was in fact nonrecourse in nature. Moreover, there is no signed assumption agreement in the record. Since the note was secured only by the film, repayment of the note was contingent upon the success of the film. Because repayment was contingent on the success of the movie and there is no evidence that the film would be successful enough to pay the note, we conclude *191 that the "recourse" note at issue has no substance, i.e., was an illusory obligation. Estate of Baron v. Commissioner,83 T.C. at 549-553. For all the foregoing reasons, we find that the transaction lacked economic substance, and petitioner's rights to depreciation deductions, miscellaneous deductions and investment tax credit must be denied. [8] We therefore need only determine whether petitioner should be subject to additional interest under section 6621(c) of the Code. Section 6621(c) provides for an increase in the rate of interest payable to 120 percent of the otherwise applicable annual rate with respect to a "substantial underpayment" (defined as an underpayment of at least $ 1,000) attributable to a tax-motivated transaction. Sec. 6621(c)(1). Additional interest accrues after December 31, 1984, regardless of the filing date of the returns. *192 DeMartino v. Commissioner,88 T.C. 583, 589 (1987). Section 6621(c)(3)(A) includes among tax-motivated transactions any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(v). Since we have held that the transaction at issue lacked economic substance, see Patin v. Commissioner, supra, petitioner is liable for the increased rate of interest under this section. See Cherin v. Commissioner,89 T.C. 986, 1000 (1987). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Includes $ 5,000 contributed by general partners.↩
3. Prior to September 5, 1978, Lorimar had reached an agreement with CBS Entertainment, a Division of CBS, Inc. (CBS), whereby CBS was to pay a minimum of $ 2,750,000 and a maximum of $ 3,750,000 for two runs of the picture. The distribution agreement in conjunction with the network television licensing agreement with CBS provided the limited partners with a guaranteed return of $ 2,250,000.↩
4. In determining whether an activity is engaged in for profit, a nonexclusive list of some relevant facts is analyzed pursuant to the regulations issued under section 183. The factors are: 1) the manner in which the taxpayer carries on the activity; 2) the expertise of the taxpayer or his advisors; 3) the time and effort expended by the taxpayer in carrying on the activity; 4) the expectation that assets used in the activity may appreciate in value; 5) the success of the taxpayer in carrying on other similar or dissimilar activities; 6) the taxpayer's history of income and losses with respect to the activity; 7) the amount of occasional profits, if any, which are earned; 8) the financial status of the taxpayer; and 9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs.↩
5. A generic tax shelter is defined as a tax shelter possessing some or all of the following characteristics: 1) tax benefits are the focus of the materials used to promote the program; 2) the investors accept the price in terms of the leases without negotiation; 3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to the tangible property included as part of the packages; 4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transaction in question; and 5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or substance. See Rose v. Commissioner,88 T.C. 386, 412 (1987), affd.    F.2d    (6th Cir., February 27, 1989). Petitioner's investment in the partnership involved several of these characteristics. Where these characteristics are apparent in a specific transaction, it is necessary to determine whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits. Rose v. Commissioner, supra."In any case where a taxpayer establishes a business purpose, i.e., an actual and honest profit objective, we may still recharacterize the terms of the transactions to accord with what we perceive to be the reality of the situation." Rose v. Commissioner,88 T.C. at 414↩. 6. For a summary of the holdings of the cases discussing whether or not a transaction lacks economic substance, see James v. Commissioner,87 T.C. 905, 918↩ (1986).
7. See Isenberg v. Commissioner,T.C. Memo. 1987-269↩.
8. Under section 48(a)(1)↩, the investment tax credit is allowed only for property with respect to which depreciation is allowable.