RICHARD GANGEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gangel v. Commissioner
Docket No. 4522-86
United States Tax Court
T.C. Memo 1991-358; 1991 Tax Ct. Memo LEXIS 407; 62 T.C.M. (CCH) 319; T.C.M. (RIA) 91358; August 5, 1991, Filed *407 Decision will be entered under Rule 155. Marvin B. Segal, Peter W. Schmidt, and Mark A. Berlin, [1] for the petitioner. Drita Tonuzi and Paulette Segal, for the respondent. FAY, Judge. FAY
Respondent determined a deficiency in petitioner's Federal income tax in the amount of $ 36,748 for taxable year 1978. Respondent also determined section 6621(c)[2] (formerly section 6621(d)) was applicable. After concession, [3] the issues remaining for decision are: (1) Whether petitioner is entitled to Schedule C losses and investment tax credits (ITC) stemming from his lithograph activities in 1978; (2) whether the deficiency for taxable year 1978 is a substantial underpayment attributable to a tax motivated transaction pursuant to section 6621(c); and (3) whether respondent's *408 motion to amend answer should be granted. If the preceding issue is determined affirmatively, then additional issues arise as to (a) whether petitioner is subject to additions to tax for negligence pursuant to 6653(a); and (b) whether these proceedings were instituted or maintained primarily for delay or whether petitioner's position is frivolous or groundless pursuant to section 6673 for taxable year 1978. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits and the supplemental stipulation of facts are incorporated by reference. The trial took place over a period of two months and consumed approximately four full days in Court. We have considered all the testimony presented in the voluminous transcripts as well as the nearly 150 pieces of documented evidence. We discuss only those facts necessary in reaching our decision. Background
Richard *409 Gangel (petitioner) resided in New York at the time the petition in this case was filed. Since 1974 petitioner has been a promoter of numerous tax shelters [4] involving equipment leasing, real estate, entertainment, and art. The tax shelters promoted by petitioner have been the subject of previous Tax Court proceedings. Petitioner's previous shelters have raised in excess of $ 400,000,000. A major tax shelter petitioner was involved in was the Energy Management System (EMS) tax shelter, which encompassed 15 corporations, approximately 80 transactions, and approximately 2,000 investors. In 1985 petitioner entered into a consent agreement with the Government to cease EMS and other tax shelter activities. Petitioner paid a penalty of $ 320,000 in connection with the consent agreement. [5]
*410 Petitioner and his family have purchased art for investment and personal purposes prior to petitioner's involvement in the transactions at issue. Petitioner, however, never used nonrecourse or limited recourse notes to finance these purchases, nor has petitioner introduced evidence he previously purchased Masters to be used to produce a limited edition as he did in the instant transactions. Master Editions, Inc.
In 1978 Master Editions, Inc. (MEI), a New York corporation, was created to market art packages. Petitioner held himself out to be MEI's chief executive officer and the originator of MEI. MEI was wholly owned by the Gangel Children's Trust. Kenneth Klein (Klein), who was an integral part of the lithograph activity under consideration here, was involved in EMS and other tax shelters. Klein was president of MEI. Klein is an attorney with specialized training in tax law. While he has no formal art training, he played an integral part in the sale of Alexander Calder tapestries. MEI was fashioned after Jackie Fine Arts. See Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), for a detailed discussion *411 of Jackie Fine Arts. Through artistic coordinator Elizabeth Weiner (Weiner), MEI acquired a number of lithographs [6] from various artists along with the related copyrights. In 1979, Roberta Boxer (Boxer) was hired as an artistic consultant. Boxer had previously been a consultant for Jackie Fine Arts. MEI began offering the packages for sale in May of 1978 and ceased operation in 1986. MEI used an Offering Memorandum to officially put the lithograph on the market. The Offering Memorandum (or prospectus) indicates each investor acquired a package consisting of a Master, a limited edition, and a copyright, which included the right to exploit the image on ancillary products almost without limitation as to form. [7] The purchase price was to consist of a small amount of cash, a short-term interest-free note, and the assumption of a ten-year 6 *412 percent note payable solely out of 50 percent of the proceeds from the exploitation of the Master. (Artist note or long-term note.) The prospectus was 50 pages long and contained 27 pages of tax discussion. An additional 31 page tax opinion was attached to the prospectus. The prospectus indicates MEI is only viable to those investors with a net worth in excess of $ 100,000 and in the 50 percent tax bracket. [8]
*413 The prospectus has projections assuming three different scenarios: (1) No sales, (2) sales of the limited editions and no ancillary rights, and (3) sales of the limited editions and ancillary rights for each of three different purchase prices. In order for the activity to be profitable, it was necessary to surpass all of the assumptions of the third scenario. MEI and Petitioner (Transaction)
Petitioner executed purchase agreements on December 29, 1978, to purchase five lithographs for the following amounts: [SEE TABLE IN ORIGINAL] [9]
*414 Petitioner made no cash outlay as called for in the prospectus. The Masters did not exist as of the date of the execution of the purchase agreements. The images were obtained by MEI from the artists for an undisclosed purchase price sometime within the 6 or 7 weeks prior to the execution of the purchase agreements. [10] As part of the purchase price, petitioner assumed the long-term limited recourse note (artist note). Petitioner made some post-acquisition attempts at distribution, all of which were unsuccessful. *415 The details of these attempts and failures lend nothing to this discussion. The due dates of the short-term notes were deferred four times. It is uncertain whether any money was ever paid under the short-term or artist notes. Tax Treatment by Petitioner
Petitioner deducted $ 145,277 of loss from his lithograph activities on Schedule C of his 1978 Federal income tax return. Petitioner's return also shows ITC of $ 112,500 stemming from his lithograph activities. OPINION This Court will analyze this case in accordance with our opinion in Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Rose set forth the common characteristics of a generic tax shelter: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; *416 and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * *
Rose v. Commissioner, supra at 412. Petitioner's transaction in issue in the instant case meets all five of the characteristics of a "generic tax shelter." If a transaction meets all the criteria of the generic tax shelter test, it is then necessary to determine if the transaction had economic substance. Accepting "the terms of purchase without price negotiation" is the only characteristic of the generic tax shelter test which petitioner presents a colorable argument he does not meet. Although the structure of MEI is rigid, because petitioner was the promoter and chief executive [11] of MEI, he was in a position to negotiate some terms, including price. Petitioner used this leverage to defer the initial cash payments and the payments on the short-term notes [12] and more importantly to increase the purchase price of the lithographs. [13] These negotiations can hardly be considered meaningful and we hold the transaction is a "generic tax shelter." *417 Economic Substance
It is abundantly clear from the record petitioner purchased the lithographs from MEI as a tax shelter without considering whether or not income might be produced, the fair market value of the lithographs, or the methods and opportunities available and the likelihood of success for exploiting the lithographs. We hold there is no relationship between the price at which petitioner purchased the lithographs and their fair market value. Petitioner's expert report was of no value to the Court. Petitioner's expert prepared her report without viewing the prints or plates or printer's documentation. Petitioner's expert's report contains several inaccuracies. Additionally, respondent raised some question as to the origin of petitioner's expert's report. Because we place no reliance on the report due to its substantive lacking, we did not examine the procedure by which it was produced. [14] Petitioner also relies upon the expertise of Dennis Anderson (Anderson) and Lawrence Casper (Casper). Both gentlemen work for MEI and were not "experts" for purposes of this proceeding. However, Anderson did testify as a fact witness and his testimony was considered. [15]
*418 Respondent's expert's report on the other hand was complete, thorough, and well researched. Mr. Cole was quite capable and invaluable to the Court in making its decision. The presence of large amounts of deferred debt, the payment of which is highly unlikely, is an indication of an absence of economic substance. Rose v. Commissioner, supra at 419. The notes in the instant case were to be paid out of 50 percent of the net receipts from the commercial exploitation of the lithographs by which they were secured. There was no recourse or personal liability to the makers, successor, or assignors. We hold the debt in this case was unlikely to be paid because the net receipts from commercial exploitation of the lithographs were likely to be minimal. There is no evidence to indicate any payments were in fact made on the long-term debt. Petitioner's transactions with MEI lacked economic substance, and, therefore, do not support any deductions or investment tax credit. Petitioner argues because he was knowledgeable in the field of art, these transactions are automatically blessed with "economic substance." While we accept petitioner had a certain success in *419 buying and selling individual works of art, there is nothing in the record to indicate petitioner had experience in buying Masters, printing limited and unlimited editions, and selling ancillary rights. On the other hand, the record is clear petitioner was experienced in promoting tax shelters. We reject petitioner's argument. Section 6621
Section 6621(c) provides for an increased interest rate for any substantial underpayment attributable to a tax-motivated transaction, including a "valuation overstatement (within the meaning of section 6659(c))" and "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(i) and (v). See also section 301.6621-2T, Q & A - 4(1), Temporary Proced. and Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). The provisions of section 6621(c) are designed for and applicable to petitioner's dealings with MEI. See Ballard v. Commissioner, T.C. Memo 1988-436. Motion to Amend Answer
At calendar call respondent filed a motion to amend answer to include additions to tax for negligence pursuant to section 6653(a) and a penalty pursuant to section 6673 for making frivolous or groundless arguments or instituting or *420 maintaining the action primarily for delay. Respondent requested action on the motion be delayed until the end of trial. Petitioner had no objection. Pursuant to a conference call held on November 14, 1990, respondent's motion to amend answer is granted in that we will consider the section 6673 issue. It is denied as to the negligence addition. Section 6673 as amended by the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7731(a), 103 Stat 2106, 2400, provides: (1) Procedures instituted primarily for delay, etc. -- Whenever it appears to the Tax Court that -- (A) proceedings before it have been instituted or maintained by the taxpayer primarily for delay, (B) the taxpayer's position in such proceeding is frivolous or groundless, or (C) the taxpayer unreasonably failed to pursue available administrative remedies,
the Tax Court, in its decision, may require the taxpayer to pay to the United States a penalty not in excess of $ 25,000.
As support for its position, respondent compares petitioner's case to the Rose v. Commissioner, supra, and Ballard v. Commissioner, supra. Those cases involve the *421 Jackie Fine Arts program. MEI was admittedly modeled after Jackie Fine Arts. Respondent asserts because Rose and Ballard were decided for the Government, petitioner knew he could not win the instant case. Therefore, respondent asserts petitioner must have instituted the case primarily for delay. While the Court was not pleased with some of petitioner's maneuvering before and during trial, on this particular record we decline to exercise our discretion to require a penalty. Therefore, petitioner is not subject to a section 6673 penalty. Decision will be entered under Rule 155. Footnotes
1. The Court granted Mr. Berlin's motion to withdraw.↩
2. All section references are to the Internal Revenue Code as amended and in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The parties have executed a closing agreement with regard to the Anwar Coal Program issue.↩
4. Petitioner often refers to tax shelters as "tax advantaged investments."↩
5. The penalty was imposed under section 6700, Promoting Abusive Tax Shelters, etc. and section 6701, Penalties for Aiding and Abetting Understatement of Tax Liability.↩
6. For purposes of this opinion, we define the term lithograph to include silk screens, serigraphs, etchings, or any other medium used to produce, print, and publish graphics.↩
7. Ancillary products are items such as tee shirts, coffee mugs, greeting cards, etc., bearing a photographic reproduction of the image. Some artists would withhold certain ancillary rights, such as the right to reproduce the image on toilet paper. This was done to protect the artist's reputation.↩
8. The $ 100,000 net worth and 50 percent bracket requirements are reiterated by the offeree questionnaire each prospective participant was required to fill out.↩
9. During trial and on brief, the lithographs were referred to by the shortened titles listed under "Litho." We will continue that practice for the remainder of the opinion.↩
10. This may seem contradictory. Each artist who was contacted by Weiner showed her certain images he thought would be appropriate for the MEI program. After discussing the matter with Klein and petitioner, Weiner would then communicate MEI's approval to the artist. The artist would then produce a Master in the same vein as the images originally shown to Weiner. The actual Masters did not exist at the time MEI purchased them from the artist. Nor did they exist at the time petitioner purchased them from MEI.↩
11. Petitioner was also an indirect owner. ↩
12. It is unclear from the record whether petitioner paid any cash towards the purchase of the lithographs. However, because we find the transaction totally devoid of economic substance, it is unimportant if petitioner paid a small amount of cash. ↩
13. The increase was reflected in an increase in the amount of the limited recourse promissory note (artist notes).↩
14. See Goulding v. Commissioner, T.C. Memo 1988-212, affd. without published opinion 928 F.2d 1135↩ (7th Cir. 1991). 15. MEI used appraisals performed by Anderson and Casper in the offering materials. The appraisals for each work of art were in the same format. Neither appraiser had the benefit of viewing the prints or plates at the time of the appraisal.↩